[Cite as *State v. El-Jones*, 2012-Ohio-4134.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| STATE OF OHIO | C.A. No. 26136 |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| ELOHIM EL-JONES | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No. CR 11 01 0136 |

DECISION AND JOURNAL ENTRY

Dated: September 12, 2012

MOORE, Presiding Judge.

{¶1} Defendant-Appellant, Elohim El-Jones, appeals from his convictions in the Summit County Court of Common Pleas. This Court affirms in part and reverses in part.

I.

{¶2} A fight between Mr. El-Jones and Michael Kirksey, the victim in this case, broke out at Chapel Hill Mall on the night of August 15, 2009. At some point during the altercation, Mr. El-Jones' pregnant girlfriend, Jazmine Lee, had bleach thrown into her face. Monica Jones, another mall patron, came to Lee's aid when she saw that Lee was injured. Lee then went to the hospital with a friend, Unique Brown. The following night, Mr. El-Jones, Lee, and Brown drove to a section of low-income housing in Akron known as The Rosemary. Lee and Brown stayed with the car while Mr. El-Jones walked off on his own. At some point, Monica Jones, the woman who had helped Lee at the mall the previous night, approached the car. Jones lived in an

apartment at The Rosemary and recognized Lee from the mall. Mr. El-Jones later came back to the car and told Lee and Brown to leave without him.

{¶3} The same night that Mr. El-Jones and his female companions drove to The Rosemary, Kirksey was watching a football game at his aunt's apartment, located within The Rosemary. It was dusk outside when a female neighbor and family friend, Jennette Bland, entered the apartment and walked to the bathroom, indicating that she was in need of a tissue. Bland spoke to someone on her cell phone as she left the bathroom and ran out the front door, passing Kirksey who was sitting in a chair nearest the window. As Bland ran out the front door, Kirksey's aunt, Nerieda Riley, observed a black man standing just outside the window of her ground-level apartment. She then heard a series of pops and realized that someone was shooting into the apartment. During the incident, Riley sustained a gunshot wound to her leg. Kirksey sustained four gunshot wounds, one of which was fatal. Before he died, Kirksey repeatedly said "Prophet." Numerous individuals identified "Prophet" as being the alias of Mr. El-Jones.

{¶4} After the shooting Mr. El-Jones told several people that he had been shot in the stomach and that he needed a ride to the hospital. Teaira Laramore, the daughter of Monica Jones, offered to drive Mr. El-Jones to the hospital. Another neighbor, Durell Bradley, drove behind Laramore's car, but the car drove past the highway exit for the hospitals and continued onto Tallmadge Avenue. After exiting at Tallmadge Avenue, Laramore drove to some apartments on Colonial Hills Drive, a place where Mr. El-Jones had family connections. Bradley spoke with Mr. El-Jones as he exited Laramore's car because she was concerned that he was injured. Mr. El-Jones, however, assured Bradley that he was not injured and showed her his stomach before running away. He had not been shot. The police quickly identified Mr. El-Jones as a suspect in the murder of Kirksey, and an arrest warrant for Mr. El-Jones issued within the

next few days. Despite an extensive manhunt, the police did not apprehend Mr. El-Jones until early 2011.

{¶5} A grand jury indicted Mr. El-Jones on the following counts: (1) aggravated murder, in violation of R.C. 2903.01(A), with the specific intent to cause death; (2) murder, in violation of R.C. 2903.02(B); (3) two counts of felonious assault, in violation of R.C. 2903.11(A)(1)/(A)(2); (4) having weapons while under disability, in violation of R.C. 2923.13(A)(2)/(A)(3); and (5) participating in a criminal gang, in violation of R.C. 2923.42(A). With the exception of the weapons under disability count, all of the foregoing counts also contained attendant firearms specifications in violation of R.C. 2941.145. Before trial, the State dismissed the charge of participating in a criminal gang. A jury then found Mr. El-Jones guilty of all the remaining charges and specifications. The trial court ultimately sentenced Mr. El-Jones to 33 years to life in prison.

{¶6} Mr. El-Jones now appeals from his convictions and raises eleven assignments of error for our review. For ease of analysis, we rearrange and consolidate several of the assignments of error.

II.

**ASSIGNMENT OF ERROR I**

THE TRIAL COURT COMMITTED REVERSIBLE AND PLAIN ERROR IN CLOSING THE COURTROOM AND NOT ALLOWING AN OPEN PUBLIC TRIAL IN VIOLATION OF [MR. EL-JONES'] SIXTH AMENDMENT RIGHTS.

**ASSIGNMENT OF ERROR II**

[MR.] EL-JONES WAS DENIED HIS CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF TRIAL COUNSEL WHEN HIS TRIAL COUNSEL FAILED TO ARGUE THAT THE COURTROOM SHOULD NOT HAVE BEEN CLOSED AS [MR.] EL-JONES WAS ALLOWED TO HAVE AN OPEN PUBLIC TRIAL.

## ASSIGNMENT OF ERROR III

THE TRIAL COURT COMMITTED REVERSIBLE AND PLAIN ERROR IN NOT DECLARING A MISTRIAL DUE TO JUROR MISCONDUCT.

## ASSIGNMENT OF ERROR IV

[MR.] EL-JONES WAS DENIED HIS CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF TRIAL COUNSEL WHEN HIS TRIAL COUNSEL FAILED TO REQUEST A MISTRIAL DUE TO JUROR MISCONDUCT.

{¶7} In his first and second assignments of error, Mr. El-Jones argues that the trial court violated his right to a public trial by closing the courtroom to the public mid-trial and that his counsel was ineffective for not challenging the court's ruling. In his third and fourth assignments of error, Mr. El-Jones argues that the court erred by not declaring a mistrial for juror misconduct and that his trial counsel was ineffective for not seeking a mistrial. Because Mr. El-Jones combines all the foregoing assignments of error in the argument section of his brief, we also address the assignments of error together.

**Public Trial**

{¶8} The Sixth Amendment to the U.S. Constitution and Article I, Section 10 of the Ohio Constitution guarantee the right to a public trial. *State v. Lane*, 60 Ohio St.2d 112, 119 (1979). "The right to a public trial is rudimentary in our judicial system, but, as with most rights, it is not absolute * * *." *Id.* at 121. It is within the authority of a trial court to order the closure of the proceedings in limited instances. *State v. Evans*, 9th Dist. No. 07CA009274, 2008-Ohio-4295, ¶ 15. In those limited instances, the right to a public trial:

> must yield to other interests, such as those essential to the administration of justice. A trial judge has authority to exercise control over the proceedings and the discretion to impose control over the proceedings. Nonetheless, the abridgement of a defendant's right to a public trial may occur only when necessary, and any closure must be narrowly drawn and applied sparingly.

*State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, ¶ 51. When a trial court orders a partial closure of proceedings, there must be a "substantial reason" to justify the closure. *Id.* at ¶ 53. In addition, "the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure." *Id.* at ¶ 52, quoting *Waller v. Georgia*, 467 U.S. 39, 48 (1984). "This Court reviews a trial court's decision to exclude spectators from the courtroom under an abuse of discretion standard * * *." *State v. Powell*, 9th Dist. No. 20067, 2001 WL 1162832, *7 (Oct. 3, 2001). An abuse of discretion means that the trial court was unreasonable, arbitrary, or unconscionable in its ruling. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶9} The trial court here closed the courtroom to the public during the testimony of the fifth witness. Before that point, the court had issued multiple warnings to members of the gallery not to engage in disruptive behavior. The court also had to admonish the gallery members at one point that they were not to speak to any of the witnesses. The court did so because one of the witnesses indicated that a gallery member, who the court believed was Mr. El-Jones' mother based on a description of her clothing, had spoken with the witness before she took the stand and suggested that she not testify. During a break in the fifth witness' testimony, one of the jurors spoke with the court due to a growing concern among the jurors with the gallery members. The juror informed the court that some gallery members had started to discuss the case in front of several jurors after the jurors had been released for the day. The juror asked if the court could release the jurors at separate intervals in the future so that they would not have to leave together. The concerns that the single juror raised caused the court to consult all twelve jurors. Apart from the juror who initially came forward, three other jurors admitted that the gallery members made

them feel either uncomfortable or intimidated. None of the jurors expressed disagreement when the court asked if their preference would be for the gallery to remain empty.

{¶10} Several witnesses also displayed overt symptoms of having been intimidated. The court placed on the record that several witnesses were afraid of Mr. El-Jones' family members, many of whom were present in the gallery. Multiple witnesses cried on the stand and were uncooperative in testifying; at times insisting that they could not remember anything that had happened. One of the witnesses also testified with her hands over her face because she did not want to be seen. The court noted that numerous family members of both Mr. El-Jones and the victim came to trial each day and it was not possible to distinguish who belonged to which family at any given time. Further, the trial judge noted that she was forced to personally speak to multiple witnesses in order to convey that they had to testify by order of the court. The court described two of the witnesses as "incredibly fearful" and "very reluctant." The judge stated that it was her impression that the witnesses were afraid of testifying in front of the members of the gallery.

{¶11} The trial court's ultimate ruling was that the trial would be closed until the last witness testified. The court allowed members of the bar, staff, and the media to continue to view the trial, but excluded other members of the public, including the families of both Mr. El-Jones and the victim. The court reopened the courtroom to the public at the time of final instructions. The result of the court's ruling was that the trial was closed for the remainder of the fifth witness' testimony and for the testimony of two additional witnesses.

{¶12} Based on our review of the record, we cannot conclude that the trial court abused its discretion by ordering a partial closure of the proceedings. The trial court placed extensive findings for its decision on the record. *See Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, at ¶

52. Those reasons included the fact that numerous jurors reported feeling either uncomfortable or intimidated and multiple witnesses struggled to testify in front of the members of the gallery. Several witnesses cried throughout their testimony, one witness covered her face as she spoke, and another testified despite a suggestion from a gallery member that she should not. Although the court had previously admonished the gallery members not to interact with any witnesses, speak to any jurors, or disrupt the proceedings while observing, the court noted that the gallery members had not heeded its admonishments. Further, the court noted that the State's last witness would be a material witness who was "extremely reluctant" to testify. The court determined that the only way to safeguard the jurors and witnesses from intimidation was to restrict public access to the trial. While the court opined that it was primarily the behavior of Mr. El-Jones' family members that necessitated the closure, the court found that it was not feasible to try to identify and restrict all of Mr. El-Jones' family members from the trial at any given time. *See id.* (court must consider reasonable alternatives before closing proceedings). Accordingly, the court limited courtroom access to members of the bar, staff, and the media.

{¶13} "[A] trial judge is responsible for the conduct of a trial and has discretion to issue reasonable orders excluding spectators in order to protect or to prevent intimidation of a witness." *State v. Bayless*, 48 Ohio St.2d 73, 109 (1976), *vacated in part on other grounds*, 438 U.S. 911 (1978). In exercising its discretion here, the court determined that a partial closure of the proceedings to spectators was necessary in order to protect both the jury and the witnesses. Even so, the court did not restrict all spectators. In particular, the court continued to allow the media to observe the trial. *See Drummond* at ¶ 55 (the presence of the media helps to "safeguard [a defendant's] right to a public trial"). The court also limited the closure to the testimony of the remaining witnesses, permitting the trial to reopen to the public at the time of final instructions.

*See id.* at ¶ 52 (closure must be narrowly tailored). The record supports the conclusion that the court had a "substantial reason" to justify the partial closure of the proceedings and tailored the closure to protect the administration of justice while preserving Mr. El-Jones' right to a public trial. *See Evans*, 2008-Ohio-4295, at ¶ 17-23. Mr. El-Jones' first assignment of error is overruled.

**Mistrial**

**{¶14}** "Mistrials need be declared only when the ends of justice so require and a fair trial is no longer possible." *State v. Franklin*, 62 Ohio St.3d 118, 127 (1991). "The essential inquiry on a motion for mistrial is whether the substantial rights of the accused are adversely affected." *State v. Wooden*, 9th Dist. No. 21138, 2003-Ohio-1917, ¶ 33, quoting *Wadsworth v. Damberger*, 9th Dist. No. 3024-M, 2000 WL 1226620, *2 (Aug. 30, 2000). If a defendant fails to move for a mistrial once he discovers the grounds that would form the basis for his motion, then he forfeits all but a claim of plain error. *State v. Wood*, 9th Dist. No. 06CA0044-M, 2007-Ohio-2673, ¶ 21-23.

> Under Crim.R. 52(B), [p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court. By its very terms, the rule places three limitations on a reviewing court's decision to correct an error despite the absence of a timely objection at trial. First, there must be an error, i.e., a deviation from a legal rule. Second, the error must be plain. To be plain within the meaning of Crim.R. 52(B), an error must be an obvious defect in the trial proceedings. Third, the error must have affected substantial rights. We have interpreted this aspect of the rule to mean that the trial court's error must have affected the outcome of the trial.

(Internal citations and quotations omitted.) *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). The burden is on the party asserting plain error to prove that "the outcome 'would have been different absent the error.'" *State v. Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, ¶ 17, quoting *State v. Hill*, 92 Ohio St.3d 191, 203 (2001).

{¶15} Mr. El-Jones argues that the court erred by not ordering a mistrial because (1) the jurors discussed his case in violation of the court's orders, and (2) three of the jurors engaged in behavior that warranted their removal. As proof that the jurors were discussing the case in violation of the court's order, Mr. El-Jones points to the portion of the transcript in which one juror spoke to the court about the members of the gallery. The juror notified the court that members of Mr. El-Jones' family had spoken about the case in front of the jury and so the jurors were "just wanting to know if * * * we could be dismissed at separate times so we're not intermingling with them." The court asked what the jury had heard and the juror replied: "Almost all the jurors have agreed with me that they * * * just heard people talking and saw people out there * * *." Mr. El-Jones argues that, because the jurors were instructed not to discuss the case outside the presence of the court, they violated the court's orders by discussing their feelings about their exposure to the members of the gallery.

{¶16} The trial court instructed the jury not to discuss the case amongst themselves until the end of trial and the submission of the court's instructions. There is no evidence that the jurors discussed the merits of the case or formed an opinion about any of the evidence. The jurors merely reported having spoken with one another about their individual exposures to the gallery members so as to identify a collective concern and bring it to the court's attention. The court specifically instructed the jury that they were not to speak with anyone connected to the case about the trial and that no one was to speak about the trial in their presence outside of the courtroom. The court told the jury: "if anyone would try to talk to you, which is unlikely – but if that were to happen, you report that immediately to me or my bailiff." In bringing their collective concerns about the gallery members to the court, the jurors were actually following the court's instructions, not disobeying them. Mr. El-Jones has not identified any evidence in the

record or pointed to any authority that the jury's conduct here was improper or adversely affected his substantial rights. *See* App.R. 16(A)(7). Accordingly, the trial court did not commit plain error by refusing to grant a mistrial.

{¶17} Next, Mr. El-Jones argues that the individual conduct of three jurors warranted a mistrial. The first of those jurors informed the court that he recognized the first police officer who testified because they went to high school together. The juror indicated that he had not seen the officer for about nineteen years. The sole purpose of the officer's testimony was to identify the crime scene. The officer did not interview any of the witnesses or collect any evidence. In his brief, Mr. El-Jones simply cites the juror's admission that he recognized the officer and then claims that he was prejudiced by that juror remaining on the jury. The record does not support Mr. El-Jones' underdeveloped argument. Although the juror went to high school with the officer, they did not maintain any relationship with one another and had not seen each other for an extensive period of time. Moreover, the officer's involvement in the case was minimal. Mr. El-Jones has not satisfied his burden of demonstrating that the juror's continued service prejudiced the outcome in this matter. *See Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, at ¶ 17. As such, a mistrial was not warranted.

{¶18} As to the other two jurors with whom Mr. El-Jones takes issue, the first expressed some difficulty focusing on the trial because he had spent the night caring for his newborn child and the second, while alert, indicated that he could not always keep his eyes open due to cataracts. The trial judge spoke with both jurors. The first juror assured the judge that he could remain alert and the record does not contain any indication that the juror experienced any difficulty remaining attentive once the trial judge spoke with him. The second juror indicated that he had taken extensive notes and was fully aware of the evidence, but struggled to keep his

eyes open at times due to a medical condition. The court later allowed the same juror to wear sunglasses so that he would not have to close his eyes. The record does not contain any indication that the second juror had any difficulty in listening to the evidence or understanding the trial.

{¶19} There is no evidence that either of the jurors Mr. El-Jones identifies missed any critical portions of the trial. *See State v. Terry*, 9th Dist. No. 23043, 2007-Ohio-6790, ¶ 12. The trial court spoke with both jurors and was satisfied that each could continue to serve. After the court spoke with the jurors, no further problems arose. Mr. El-Jones has failed to set forth any specific argument as to how he was prejudiced by the court's decision to allow both jurors to continue serving. *See* App.R. 16(A)(7). Based on our review of the record, Mr. El-Jones has not demonstrated that the trial court committed plain error by not ordering a mistrial. Mr. El-Jones' third assignment of error is overruled.

**Ineffective Assistance**

{¶20} This Court must analyze claims of ineffective assistance of counsel under a standard of objective reasonableness. *See Strickland v. Washington*, 466 U.S. 668, 688 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 142 (1989). Under this standard, a defendant must show (1) deficiency in the performance of counsel "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and (2) that the errors made by counsel were "so serious as to deprive the defendant of a fair trial * * *." *Strickland*, 466 U.S. at 687. A defendant must demonstrate prejudice by showing that, but for counsel's errors, there is a reasonable probability that the outcome of the trial would have been different. *Id.* at 694. In applying this test, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance * * *." *Id.* at 689.

{¶21} Mr. El-Jones argues that he received ineffective assistance of counsel because his trial counsel did not object to the partial closing of his trial and did not seek a mistrial based on juror misconduct. As set forth above, however, the trial court did not abuse its discretion by ordering the partial closure of the trial, and Mr. El-Jones did not show that the jurors engaged in any misconduct that adversely affected his substantial rights. Consequently, Mr. El-Jones cannot demonstrate that he was prejudiced as a result of his counsel's failure to object to the partial closure of the trial or to seek a mistrial due to juror misconduct. *Strickland* at 694. Mr. El-Jones' second and fourth assignments of error are overruled.

### ASSIGNMENT OF ERROR V

[MR. EL-JONES'] CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

### ASSIGNMENT OF ERROR VI

THE TRIAL COURT COMMITTED REVERSIBLE AND/OR PLAIN ERROR WHEN IT OVERRULED [MR. EL-JONES'] CRIM. R. 29(A) MOTION FOR JUDGMENT OF ACQUITTAL BECAUSE THE STATE PRESENTED INSUFFICIENT EVIDENCE TO SUSTAIN A CONVICTION.

{¶22} In his fifth and sixth assignments of error, Mr. El-Jones argues that his convictions are based on insufficient evidence and are against the manifest weight of the evidence. Because Mr. El-Jones combines his sufficiency and weight assignments of error in his brief, we also address the two together. We do not agree that Mr. El-Jones' convictions are based on insufficient evidence or are against the manifest weight of the evidence.

{¶23} "We review a denial of a defendant's Crim.R. 29 motion for acquittal by assessing the sufficiency of the State's evidence." *State v. Frashuer*, 9th Dist. No. 24769, 2010-Ohio-634, ¶ 33. In order to determine whether the evidence before the trial court was sufficient

to sustain a conviction, this Court must review the evidence in a light most favorable to the prosecution. *State v. Jenks*, 61 Ohio St.3d 259, 273 (1991).

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*Id.* at paragraph two of the syllabus; *see also State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). "In essence, sufficiency is a test of adequacy." *Thompkins* at 386.

{¶24} Mr. El-Jones does not challenge any particular element of any of his convictions for aggravated murder, murder, felonious assault, or having weapons while under disability. Instead, he focuses only on the State's proof of identity, arguing that there was no proof that he perpetrated the crimes. *See State v. Flynn*, 9th Dist. No. 06CA0096-M, 2007-Ohio-6210, ¶ 12 ("[I]dentity is an element that must be proven by the state beyond a reasonable doubt * * *.").

{¶25} Lee testified that Mr. El-Jones is the father of her child and that she, Mr. El-Jones, and Brown were at Chapel Hill Mall on August 14, 2009, when Mr. El-Jones engaged in a physical altercation with two men. Lee was pushed down and had bleach thrown in her eyes by an unknown individual. Another woman Lee did not know, who the State later identified as Monica Jones, helped Lee clean the bleach from her eyes. Lee then went to the hospital with Brown and lost track of Mr. El-Jones. Mr. El-Jones contacted Lee the next day.

{¶26} Lee testified that the following evening Mr. El-Jones asked her for a ride to The Rosemary. Lee was vaguely familiar with the apartment complex, but unaware of Mr. El-Jones' reasons for wanting to go there. Once they arrived, Mr. El-Jones left on foot and Lee stayed at the car along with Brown. Jones then approached Lee's car and asked if Lee remembered her.

Lee recognized the woman as the woman who had helped her at Chapel Hill Mall the previous night, and the two women spoke for a while. Lee testified that, after an unspecified period of time, Mr. El-Jones came back to the car and told her and Brown to leave. Lee observed that Mr. El-Jones was holding himself and acting like he was hurt, but insisted that she leave. Lee drove to the apartment of one of Mr. El-Jones' relatives on Colonial Hills Drive and waited. Mr. El-Jones later arrived at the apartment. Lee testified that, after the night of the shooting, she did not see Mr. El-Jones again until his arrest in 2011. Lee confirmed that Mr. El-Jones was known by some people by the name "Prophet."

{¶27} Jennette Bland testified that she and two other women were sitting on a stoop of one of the apartments in The Rosemary on the night of the shooting when Mr. El-Jones approached on foot. Mr. El-Jones spoke to the group for a period of time and described having been "jumped by Mike" the day before. Bland understood Mr. El-Jones to be referring to Michael Kirksey. Mr. El-Jones then indicated that he was looking for Kirksey and said he would "see him later * * *." Bland stated that she thought Mr. El-Jones meant to fight Kirksey, but that she later discovered Kirksey had been killed. When Bland referred to Mr. El-Jones by name during her testimony, she called him "Prophet."

{¶28} Durell Bradley, another resident of The Rosemary, testified that she ran outside on the night of the shooting when she heard screaming. Bradley recognized Mr. El-Jones standing near Monica Jones' car and seeking a ride to the hospital. At that point, Mr. El-Jones was holding his stomach and indicating that someone had shot him. Bradley had difficulty finding her car keys. By the time she found them, Mr. El-Jones had gotten into Jones' car with Jones' daughter, Teaira Laramore. Bradley decided to follow Laramore and Mr. El-Jones in her own car. Rather than drive to the hospital, Laramore drove Mr. El-Jones to an apartment

complex located off Tallmadge Avenue with Bradley following behind them. When Mr. El-Jones exited the car, Bradley also exited her car and insisted that Mr. El-Jones go to the hospital. At that pointed, Mr. El-Jones assured Bradley that he was not injured and showed her his stomach before running away. Bradley did not learn that Kirksey had been killed until she returned to The Rosemary. Like Bland, Bradley referred to Mr. El-Jones as "Prophet" throughout her testimony.

{¶29} Nerieda Riley testified that her nephew, Kirksey, came to her house on the evening of the shooting to watch a football game. Kirksey sat in a chair nearest the door as the game reached half-time. Before the shooting took place, Riley saw a dark figure outside her apartment's front window. She then heard gunfire. Kirksey was shot four times, but managed to run from the chair and climb to the top of the stairs at the apartment before collapsing. Riley also sustained a gunshot wound to the leg. Before he died, Riley repeatedly heard Kirksey say the name "Prophet."

{¶30} Detective Sergeant David Garro of the Akron Police Department testified that he investigated Kirksey's murder and spoke to numerous witnesses shortly after the shooting. Detective Garro quickly identified Mr. El-Jones as the primary suspect in the shooting and obtained a warrant for his arrest on or around August 17, 2009. From that point forward, Detective Garro testified, the police department, its Violent Fugitive Task Force, and the U.S. Marshals searched for Mr. El-Jones. Detective Garro testified that the police searched Mr. El-Jones' residence, spoke with his family, and searched all the places that he might likely be, including locations in two other states. The police finally apprehended Mr. El-Jones in Akron in January 2011.

{¶31} Mr. El-Jones argues that the State failed to prove identity because no one ever conclusively placed him at Riley's apartment at the time of the shooting or saw him with a gun. He further notes that the State was unable to produce any forensic evidence linking him to the murder. Yet, "[t]he identity of a perpetrator may be established by direct or circumstantial evidence." *State v. Seabeck*, 9th Dist. No. 25190, 2011-Ohio-3942, ¶ 12. The State set forth evidence that Mr. El-Jones had fought with Kirksey the night before the shooting, rode to The Rosemary the night of the shooting, and indicated that he was looking for Kirksey directly before the shooting occurred. The State further introduced evidence that Mr. El-Jones had lied to several people directly after the shooting about having sustained a gunshot wound in order to secure a ride from the area. Mr. El-Jones then evaded arrest for over a year, despite an outstanding arrest warrant and a manhunt conducted by several law enforcements agencies. *See State v. Nichols*, 9th Dist. No. 24900, 2010-Ohio-5737, ¶ 11, quoting *State v. Taylor*, 78 Ohio St.3d 15, 27 (1997) ("It is an established principle of law that '[f]light from justice * * * may be indicative of a consciousness of guilt.'"). Viewing the evidence in a light most favorable to the State, a rational trier of fact could have concluded that the State set forth sufficient evidence that Mr. El-Jones perpetrated the crimes at issue. Therefore, Mr. El-Jones' argument that the State failed to prove identity lacks merit. His sixth assignment of error is overruled.

{¶32} Mr. El-Jones also argues that his convictions are against the manifest weight of the evidence. In determining whether a conviction is against the manifest weight of the evidence an appellate court:

> must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). A weight of the evidence challenge indicates that a greater amount of credible evidence supports one side of the issue than supports the other. *Thompkins*, 78 Ohio St.3d at 387. Further, when reversing a conviction on the basis that the conviction was against the manifest weight of the evidence, the appellate court sits as the "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony. *Id.* Therefore, this Court's "discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). *See also Otten*, 33 Ohio App.3d at 340.

{¶33} Mr. El-Jones does not set forth a separate manifest weight analysis in his brief. The only portion of his argument that resembles a weight of the evidence argument is his assertion that Jennette Bland gave inconsistent statements to the police. Based on our review of the record, we do not agree that Mr. El-Jones' convictions are against the manifest weight of the evidence.

{¶34} Bland admitted in her testimony that she gave varying versions of the events, at one point telling the police that she saw Mr. El-Jones walking towards Riley's apartment window with a gun, but later disclaiming that statement. Bland repeatedly stated during her testimony that she did not want to testify anymore. She covered her face with her hands during her testimony, but insisted that she was just nervous and scared because she did not want anyone to think she was a part of the shooting. Bland was also extremely reluctant to identify Mr. El-Jones at trial, insisting on pointing at him and refusing to describe him or what he was wearing. Bland admitted that before she was scheduled to testify at the point the trial was first scheduled, she received a death threat. Detective Garro confirmed that Bland was afraid at the time the trial originally was scheduled to go forward. He testified that Bland was taken to a hotel for several

days and kept under police protection. Moreover, Detective Garro explained to the jury that it is common for witnesses who live in areas like The Rosemary not to want to talk to the police or cooperate in an investigation because they fear retribution.

{¶35} The jury was in the best position to view Bland, hear her testimony, and judge her credibility. *State v. Shue*, 97 Ohio App.3d 459, 466 (9th Dist.1994) ("Evaluating evidence and assessing credibility are primarily for the trier of fact."). Further, even apart from Bland's testimony, several other witnesses placed Mr. El-Jones at the scene of the shooting and testified that he lied about having sustained a gunshot wound in order to secure a ride away from The Rosemary. The jury also heard testimony that Mr. El-Jones evaded arrest for over a year after the shooting, despite an outstanding warrant and extensive manhunt. Based on our review of the record, we cannot say that this is the exceptional case where the jury clearly lost its way by choosing to believe the State's version of the events. *Otten*, 33 Ohio App.3d at 340. Mr. El-Jones' fifth assignment of error is overruled.

### ASSIGNMENT OF ERROR VII

THE TRIAL COURT COMMITTED REVERSIBLE AND PLAIN ERROR IN ASSESSING COURT COSTS AGAINST [MR.] EL-JONES WITHOUT COMPLYING WITH R.C. 2947.23(A).

### ASSIGNMENT OF ERROR VIII

[MR.] EL-JONES WAS DENIED HIS CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL WHEN HIS TRIAL COUNSEL FAILED TO ARGUE THAT THE TRIAL COURT'S IMPOSITION OF COURT COSTS UNDER R.C. 2947.23(A) WAS DEFECTIVE.

### ASSIGNMENT OF ERROR IX

THE TRIAL COURT COMMITTED REVERSIBLE AND PLAIN ERROR IN ASSESSING ATTORNEY FEES AGAINST [MR. EL-JONES] WITHOUT COMPLYING WITH R.C. 2941.51(D), AND NOT DOING SO IN OPEN COURT.

{¶36} In his seventh and ninth assignments of error, Mr. El-Jones argues that the court erred by imposing costs and attorney fees against him. In his eighth assignment of error, he argues that his trial counsel was ineffective for failing to object to the court's imposition of costs.

{¶37} "R.C. 2947.23 mandates that the trial court assess the cost of prosecution against a convicted criminal defendant." *State v. Payne*, 9th Dist. No. 21178, 2003-Ohio-1140, ¶ 15. Yet, a trial court must orally inform a defendant of his obligation to pay costs at the time of sentencing so as to give the defendant an opportunity to claim indigency and seek a waiver of payment. *State v. Joseph*, 125 Ohio St.3d 76, 2010-Ohio-954, ¶ 22. Similarly, R.C. 2941.51(D) allows a trial court to order a defendant to pay some or all of his court-appointed attorney fees, but only after finding that the defendant is financially capable of doing so. *State v. Marrero*, 9th Dist. No. 10CA009867, 2011-Ohio-3745, ¶ 20. A trial court commits reversible error when it imposes costs or attorney fees against a defendant in the absence of such a notification. *Joseph* at ¶ 22; *State v. Warner*, 9th Dist. No. 96CA006534, 2001 WL 1155698, *3-4 (Sept. 21, 2001). The appropriate remedy for such an error as to costs is a "remand * * * to the trial court for the limited purpose of allowing [the defendant] to move the court for a waiver of the payment of court costs." *State v. Stallworth*, 9th Dist. No. 25461, 2011-Ohio-4492, ¶ 32, quoting *Joseph* at ¶ 23. As to an error in the imposition of attorney fees, the appropriate remedy is a remand for "a determination of [the defendant's] financial ability to pay for his court-appointed counsel." *Warner* at *4.

{¶38} The record reflects that the trial court imposed costs and attorney fees upon Mr. El-Jones in its sentencing entry, but did not orally inform him of his obligation to pay costs or inform him that he would be responsible for his attorney fees at the time of sentencing. Mr. El-Jones, therefore, did not have the opportunity to claim an inability to pay based on his indigency.

His seventh and ninth assignments of error are sustained on that basis and the matter is remanded to allow him to seek a waiver of court costs and for a determination of his ability to pay his attorney fees. *Joseph* at ¶ 23; *Warner* at *4.

{¶39} In light of our resolution of Mr. El-Jones' seventh and ninth assignments of error, his argument that his trial counsel was ineffective for failing to object to the imposition of costs is moot. *State v. Ross*, 9th Dist. No. 25778, 2012-Ohio-1389, ¶ 29-30. Therefore, we decline to address his eighth assignment of error. App.R. 12(A)(1)(c).

## ASSIGNMENT OF ERROR X

THE TRIAL COURT COMMITTED REVERSIBLE AND PLAIN ERROR WHEN IT SENTENCED [MR.] EL-JONES BASED ON INFORMATION NOT CONTAINED IN THE RECORD.

## ASSIGNMENT OF ERROR XI

[MR.] EL-JONES WAS DENIED HIS CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF TRIAL COUNSEL WHEN HIS TRIAL COUNSEL FAILED TO ARGUE THAT THE TRIAL [COURT] SHOULD NOT HAVE CONSIDERED INFORMATION NOT CONTAINED IN THE OFFICIAL RECORD WHEN IT SENTENCED [MR.] EL-JONES.

{¶40} In his tenth assignment of error, Mr. El-Jones argues that the trial court erred by sentencing him (1) on a community control violation in the absence of a hearing at which the State produced evidence, and (2) based partially on a recording the judge viewed at the suppression stage that was never admitted into evidence. In his eleventh assignment of error, Mr. El-Jones argues that his trial counsel was ineffective for failing to object to the foregoing deficiencies.

{¶41} This Court lacks jurisdiction to consider the arguments that the trial court failed to hold a hearing on Mr. El-Jones' community control violation or that Mr. El-Jones' trial counsel was ineffective for not alerting the trial court to that alleged error. Mr. El-Jones only filed a

notice of appeal in Criminal Case No. 2011-01-0136 and only attached the sentencing entry from that case. Yet, the trial court did not sentence Mr. El-Jones to a community control violation in Case No. 2011-01-0136. The community control violation arose from Criminal Case No. 2009-03-0856. And while the trial court held a combined sentencing hearing for both this case and Case No. 2009-03-0856, the sentencing entry in this case only indicates that Mr. El-Jones must serve his sentence in this case concurrently with Case No. 2009-03-0856 (the community control violation). It does not set forth a finding of guilt on the community control violation or the actual sentence the court imposed for the violation. An appeal from the community control violation imposed in Case No. 2009-03-0586 is not before this Court.

{¶42} "This [C]ourt does not have jurisdiction to review the trial court's decision absent the filing of a notice of appeal pursuant to App.R. 4, App.R. 5, and R.C. 2505.04." *State v. Daniels*, 9th Dist. No. 98CA007211, 2001 WL 276350, *4 (Mar. 21, 2001). Because Mr. El-Jones has not filed a notice of appeal from the entry sentencing him to a community control violation in Case No. 2009-03-0856, we lack jurisdiction to consider the alleged errors arising out of that conviction. *See State v. Culgan*, 9th Dist. No. 08CA0080-M, 2009-Ohio-2783, ¶ 9. As such, we do not reach the merits of Mr. El-Jones' tenth and eleventh assignments of error insofar as they concern his community control violation.

{¶43} Next, Mr. El-Jones argues that the trial court erred in sentencing him because, as a part of its sentencing rationale, the court referenced a recording of Mr. El-Jones' interview with the police. The trial court viewed the recording as a result of Mr. El-Jones' motion to have it suppressed and ruled that the State could play the recording for the jury. Although the State ultimately chose not to introduce the recording at trial, the trial court referred to the recording at

sentencing. Mr. El-Jones argues that it was improper for the court to consider the recording in its sentencing rationale because the recording was never admitted as evidence.

{¶44} Mr. El-Jones cites this Court to R.C. 2947.06 as the source for matters a trial court may consider in sentencing a defendant. That statute, however, only pertains to mitigation testimony. R.C. 2947.06. It does not prohibit a sentencing court from considering evidence introduced at the suppression stage of the same criminal case. R.C. Chapter 2929 governs sentencing. In particular, R.C. 2929.11 and 2929.12 set forth a nonexclusive list of factors a court must consider in felony sentencing and R.C. 2929.19 pertains to sentencing hearings. *See State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, ¶ 36-47. R.C. 2929.19(B)(1) provides that, among other enumerated items, "the court, before imposing sentence, shall consider the record * * *." Mr. El-Jones has not pointed this Court to any authority standing for the proposition that the court could not consider the recording it reviewed at the suppression stage as part of "the record" it was required to consider before sentencing Mr. El-Jones. R.C. 2929.19(B)(1). *See generally State v. Myers*, 9th Dist. No. 3078-M, 2001 WL 324397, *2 (Apr. 4, 2001) (court did not err by considering videotape during sentencing hearing that the State did not introduce during the guilt phase of the trial). Moreover, Mr. El-Jones has not shown that he was prejudiced by the court's consideration of the recording. The court indicated that its two biggest concerns in sentencing Mr. El-Jones were his behavior in court and the fact that the court felt Mr. El-Jones had taken steps to plan Kirksey's shooting and to feign his own injury, lying about a non-existent gunshot wound to facilitate his escape. The court pointed to the recording as an example of Mr. El-Jones' inability to cooperate or acknowledge any wrongdoing. Specifically, the court noted that in the recording Mr. El-Jones denied knowing Lee, the mother of his child, and also denied knowing his cousin. Even absent the recording, however, there was other evidence in the record

to support the trial court's sentencing concerns. That evidence included the fact that Mr. El-Jones evaded a police manhunt for over a year.

{¶45} Mr. El-Jones has not shown that the trial court erred by considering the recording of his interview with police during sentencing or that he was prejudiced by the court's consideration of the recording. As such, his tenth assignment of error is overruled. Because Mr. El-Jones has not shown error or prejudice as a result of the court's consideration of the record, his ineffective assistance of counsel argument also must fail, as it is premised upon the same error. Accordingly, Mr. El-Jones' eleventh assignment of error is also overruled.

III.

{¶46} Mr. El-Jones' seventh and ninth assignments of error are sustained, and the matter is remanded to afford him the opportunity to seek a waiver of the payment of court costs and for a determination of his ability to pay his attorney fees. Mr. El-Jones' remaining assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed in part, reversed in part, and the cause is remanded for further proceedings consistent with the foregoing opinion.

Judgment affirmed in part,
reversed in part,
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed equally to both parties.

_____
CARLA MOORE
FOR THE COURT

CARR, J.
BELFANCE, J.
CONCUR.


APPEARANCES:

DENISE E. FERGUSON, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.