[Cite as *State v. Knight*, 2020-Ohio-6709.]

| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
|---|---|---|---|
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | | |

| STATE OF OHIO | | C.A. No. 29057 |
|---|---|---|
| Appellee | | |
| v. | | APPEAL FROM JUDGMENT ENTERED IN THE |
| WILLIAM M. KNIGHT | | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | | CASE No. CR 17 04 1153 |

## DECISION AND JOURNAL ENTRY

Dated: December 16, 2020

CARR, Presiding Judge.

{¶1} Defendant-Appellant, William Knight, moved to reopen his appeal from the judgment of the Summit County Court of Common Pleas after this Court affirmed his convictions in *State v. Knight*, 9th Dist. Summit No. 29057, 2019-Ohio-2990. We granted the application to reopen, and this matter is now before us for decision. For the following reasons, we confirm our prior decision.

I.

{¶2} In *State v. Graves*, this Court explained its obligations in a reopened appeal as follows:

Under Rule 26(B)(9) of the Ohio Rules of Appellate Procedure, "[i]f th[is] [C]ourt finds that the performance of appellate counsel was deficient and the applicant was prejudiced by that deficiency, [it] shall vacate its prior judgment and enter the appropriate judgment. If th[is][C]ourt does not so find, [it] shall issue an order confirming its prior judgment." Deficient performance by a lawyer is a performance that falls below an objective standard of reasonable representation. *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, at ¶ 204 (citing *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984)). A defendant is prejudiced by the

deficiency if there is a reasonable probability that, but for his lawyer's errors, the result of the proceeding would have been different. *Id.* (citing *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

(Alterations sic.) 9th Dist. Lorain No. 08CA009397, 2011-Ohio-5997, ¶ 9. With those obligations in mind, we turn to the facts underlying the instant appeal.

{¶3} Someone stole a dirt bike from Knight's son-in-law. About a year later, the son-in-law spotted his bike for sale on Facebook. A friend of his contacted the individual who posted the bike for sale (J.B.) and feigned interest in purchasing it. Once contact was established, the son-in-law assumed his friend's identity and asked to see the bike in person. J.B. instructed the son-in-law to come to his home before dark to see the bike. He did not have the bike, however, as he had merely posted it for sale on behalf of a friend. His friend, the victim in this matter, planned to drive the bike to J.B.'s residence for the meeting.

{¶4} The victim stored the bike at his uncle's house on Danmead Avenue, a residential, dead-end street. The cold weather made it difficult for him to start the bike that evening, so he ultimately instructed J.B. to lead the son-in-law to him. J.B. and the son-in-law then drove their respective vehicles to Danmead Avenue. All the while, the son-in-law sent his wife updates by text message and instructed her and her father, Knight, to meet him there. Knight and his daughter arrived while the son-in-law and the victim were discussing the bike, and the daughter immediately called 911. After she exited Knight's truck, he pulled further down the street, circled, and parked facing toward Eastwood Avenue. Eventually, he exited his truck and stood just outside it.

{¶5} Accounts varied with respect to what occurred after Knight and his daughter arrived, but the situation quickly escalated once the son-in-law revealed his true identity, produced the title for the bike, and demanded that the victim hand it over. Words were exchanged, and the victim, who was seated on the bike as it ran, attempted to take off. He was prevented from doing

so by the son-in-law, who had a hold of the clutch and refused to let go. As the victim revved the accelerator and redlined the engine, Knight fired a gun into the air in the hopes of ending the confrontation. The victim then managed to break the son-in-law's hold and quickly accelerated toward Eastwood Avenue. He sideswiped a car parked nearby, however, and the bike spun away from Eastwood Avenue. The front of the bike then came up off the ground, as if the victim had executed a "wheelie[,]" and Knight fired a second shot. The second shot struck the victim in the head, killing him instantly.

{¶6} A grand jury indicted Knight on one count of murder, one count of felony murder, two counts of felonious assault, and four attendant firearm specifications. He argued self-defense and defense of others at trial, but a jury rejected his defenses and found him guilty on all counts. After merging his convictions and specifications, the trial court sentenced him to 18 years in prison.

{¶7} On direct appeal, Knight argued that the trial court erred when it issued the jury an instruction on defense of property. *Knight*, 2019-Ohio-2990, at ¶ 9-12. Additionally, he argued that (1) his attorney was ineffective for failing to renew his objection to the instruction, *id.*; and (2) his convictions were against the manifest weight of the evidence, *id.* at ¶ 13-15. This Court rejected his challenge to the jury instruction on the basis that he had forfeited his argument in the lower court and had not argued plain error on appeal. *See id.* at ¶ 10-11. Though he assigned as error that his counsel was ineffective for not preserving his objection, we rejected his ineffective assistance argument because it was underdeveloped and conclusory in nature. *Id.* at ¶ 12. Likewise, we conducted an abbreviated review of his manifest weight challenge and rejected it "based upon the limited argument presented * * *." *Id.* at ¶ 15. Having overruled all of Knight's assignments of error, this Court affirmed his convictions. *Id.* at ¶ 16.

{¶8}    Following this Court's decision, Knight moved to reopen his appeal on the basis that he had received ineffective assistance of appellate counsel.  This Court granted his application to reopen and appointed new counsel.  Knight now raises five assignments of error for our review, the last of which he has sub-divided into two parts.  Pursuant to App.R. 26(B)(7), he also has addressed the claim that his prior appellate counsel was deficient and that he was prejudiced by that deficiency.  To facilitate our review, we reorder and consolidate several of the assignments of error.

## II.

### ASSIGNMENT OF ERROR V PART A

THE CONVICTIONS AND SENTENCES VIOLATE OHIO'S CONSTITUTION AND AMENDMENTS TO THE UNITED STATES CONSTITUTION.  DUE COURSE AND PROCESS OF LAW REQUIRED APPLICATION OF THE BENEFIT IN THE SWITCH OF THE BURDEN OF PROOF FOR CLAIMS OF SELF-DEFENSE AND DEFENSE OF OTHERS IN ANY CASE OF DIRECT APPELLATE REVIEW PENDING ON AND AFTER MARCH 28, 2019.

### ASSIGNMENT OF ERROR V PART B

THERE WAS INSUFFICIENT EVIDENCE OF PROOF BEYOND A REASONABLE DOUBT THAT THE ACCUSED DID NOT USE FORCE IN SELF-DEFENSE OR DEFENSE OF OTHERS UNDER THE BURDEN-SHIFTING STATUTE OF SELF-DEFENSE AND DEFENSE OF OTHERS NOW IN EFFECT.

{¶9}    In his fifth assignment of error, Knight argues, in two parts, that his convictions are based on insufficient evidence.  Because the self-defense statute was amended when this matter was pending on appeal, Knight argues that the amended version of the statute applies and his convictions may stand only if the State set forth sufficient evidence to convict him under the amended statute.  According to Knight, the State's evidence does not support a conviction under the current version of R.C. 2901.05(B).  For the following reasons, we reject his arguments.

{¶10} "Section 28, Article II of the Ohio Constitution prohibits the General Assembly from passing retroactive laws." *State v. Adkins*, 129 Ohio St.3d 287, 2011-Ohio-3141, ¶ 12. "A statute is presumed to be prospective in its operation unless expressly made retrospective." R.C. 1.48. "[I]f the statute is silent on the question of its retroactive application, we must apply it prospectively only." *Hyle v. Porter*, 117 Ohio St.3d 165, 2008-Ohio-542, ¶ 10. A court may not infer retroactivity from merely "suggestive language." *Id.* "[T]o overcome the presumption that a statute applies prospectively, a statute must 'clearly proclaim' its retroactive application." *Id.*, quoting *State v. Consillio*, 114 Ohio St.3d 295, 2007-Ohio-4163, paragraph one of the syllabus.

{¶11} The crimes that led to Knight's convictions occurred on March 20, 2017. His trial commenced on April 2, 2018, and he was sentenced on April 30, 2018. On March 28, 2019, while his direct appeal was pending, the General Assembly amended Ohio's self-defense statute. *See* 2019 A.m.Sub.H.B. No. 228. The amendments reallocated the burden of proof in self-defense cases, making it the State's burden to *disprove* a claim of self-defense or defense of others if evidence tending to support either theory was presented. *See* R.C. 2901.05(B); *State v. Williams*, 9th Dist. Summit No. 29444, 2020-Ohio-3269, ¶ 10. Because his appeal was pending when the statute was amended and is currently pending before this Court on reopening, Knight argues that the Ohio Constitution requires us to review his convictions under the amended version of the statute. According to Knight, his convictions are based on insufficient evidence because the State failed to satisfy its burden under R.C. 2901.05(B), as amended.

{¶12} The newly enacted version of the self-defense statute reads, in pertinent part:

(A) * * * The burden of going forward with the evidence of an affirmative defense, and the burden of proof * * * for an affirmative defense other than self-defense[ or] defense of another * * * is upon the accused.

(B)(1) A person is allowed to act in self-defense[ or] defense of another * * *. If, at the trial of a person who is accused of an offense that involved the person's use

of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense[ or] defense of another * * *, the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense[ or] defense of another * * *.

The statute does not contain any express language evidencing the legislature's intent to have it apply retroactively. *See Hyle*, 117 Ohio St.3d 165, 2008-Ohio-542, at ¶ 10. Accordingly, its plain language supports the conclusion that it applies prospectively. *See id.*; R.C. 1.48.

{¶13} Notably, our sister districts have reached different conclusions when asked to identify the exact point at which the amendments to R.C. 2901.05(B) apply prospectively. Some districts have concluded that the amendments apply only if they were already in effect when an offender committed his offense(s). *See, e.g., State v. Irvin*, 2d Dist. Montgomery No. 28495, 2020-Ohio-4847, ¶ 26; *State v. McEndree*, 11th Dist. Ashtabula No. 2019-A-0038, 2020-Ohio-4526, ¶ 46; *State v. Brooks*, 5th Dist. Richland No. 2019 CA 0104, 2020-Ohio-4123, ¶ 43; *State v. Williams*, 3d Dist. Allen No. 1-19-39, 2019-Ohio-5381, ¶ 12, fn. 1. Other districts have concluded that the amendments apply if they were in effect at the time of the offender's trial, regardless of when he committed his offense(s). *See, e.g., State v. Reyes-Figueroa*, 8th Dist. Cuyahoga No. 108609, 2020-Ohio-4460, ¶ 23; *State v. Lewis*, 12th Dist. Butler No. 2019-07-128, 2020-Ohio-3762, ¶ 26; *State v. Carney*, 10th Dist. Franklin No. 19AP-402, 2020-Ohio-2691, ¶ 31. In spite of the split of authority on that issue, however, this Court is unaware of any appellate court that has applied the amendments to R.C. 2901.05(B) in a case where an offender was convicted before the effective date of the statute. To the contrary, our sister districts have uniformly found that the amendments to R.C. 2901.05(B) do not apply retroactively. *See State v. Zafar*, 10th Dist. Franklin No. 19AP-255, 2020-Ohio-3341, ¶ 28-32; *State v. Fisher*, 8th Dist. Cuyahoga No. 108494, 2020-Ohio-670, ¶ 24, fn. 2; *State v. Moore*, 5th Dist. Muskingum No. CT2019-0030, 2020-Ohio-342, ¶ 8-12; *State v. Koch*, 2d Dist. Montgomery No. 28000, 2019-Ohio-4099, ¶ 97-104; *State v. Lechner*,

4th Dist. Highland No. 19CA3, 2019-Ohio-4071, ¶ 34-38; *State v. Hudson*, 1st Dist. Hamilton No. C-170681, 2019-Ohio-3497, ¶ 15, fn.1; *State v. Thomas*, 11th Dist. Portage No. 2017-P-0094, 2019-Ohio-2795, ¶ 36, fn.1. Likewise, this Court has refused to apply the amendments retroactively. *See State v. Robinson*, 9th Dist. Lorain No. 19CA011495, 2020-Ohio-4502, ¶ 17; *State v. Brown*, 9th Dist. Wayne No. 19AP0004, 2020-Ohio-529, ¶ 23.

{¶14} Knight attempts to frame the question of R.C. 2901.05(B)'s retroactivity as an issue of due process and equal protection. He claims that his right to a fair trial under the Ohio Constitution will be offended if he is deprived of a review under the newly enacted burden-shifting scheme. Yet, the Ohio Constitution expressly eschews retroactive laws. *See* Section 28, Article II of the Ohio Constitution. At the time R.C. 2901.05(B) was amended, Knight's trial had been over for nearly a year. *Compare Isaac v. Engle*, 646 F.2d 1122 (6th Cir.1980), *rev'd*, 646 F.2d 1129 (6th Cir.1980), *rev'd*, 456 U.S. 107 (1982) (pertaining to application of burden-shifting statute that was enacted before the trials of the defendants therein). He has failed to cite any authority standing for the proposition that he is entitled to have his convictions reviewed under a statute that was not enacted until after he was convicted. *See* App.R. 16(A)(7). The change to the self-defense statute "does not involve the recognition of a new constitutional rule." *Koch* at ¶ 101. *Compare Griffith v. Kentucky*, 479 U.S. 314 (1987) (defendant entitled to application of constitutional rule newly declared while his case was pending on direct review). Moreover, "'it does not equate to [a] finding [that] the former statute [was] unconstitutional.'" *Koch* at ¶ 101, quoting *State v. Krug*, 11th Dist. Lake No. 2018-L-056, 2019-Ohio-926, ¶ 24. Because the current version of R.C. 2901.05(B) is not retroactive and was not enacted until after Knight was convicted, it does not apply here. *See Koch* at ¶ 97-104; *Zafar*, 2020-Ohio-3341, at ¶ 28-32. *See also State*

*v. Brown*, 9th Dist. Wayne No. 19AP0004, 2020-Ohio-529, ¶ 23.  Accordingly, both portions of Knight's fifth assignment of error are overruled.

## ASSIGNMENT OF ERROR III

THE CONVICTIONS AND SENTENCES ARE CONTRARY TO LAW IN VIOLATION OF OHIO'S CONSTITUTION AND AMENDMENTS TO THE UNITED STATES CONSTITUTION AS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶15}  In his third assignment of error, Knight argues that his convictions are against the manifest weight of the evidence.  Specifically, he argues that the jury lost its way when it failed to conclude that his sole purpose in shooting the victim was to protect himself and his family.  We disagree.

{¶16}  A conviction that is supported by sufficient evidence may still be found to be against the manifest weight of the evidence.  *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).

> In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986).  "A manifest-weight challenge can be successful "'only in the exceptional case in which the evidence weighs heavily against the conviction.'"  *State v. Hundley*, Slip Opinion No. 2020-Ohio-3775, ¶ 80, quoting *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶17}  To establish self-defense when deadly force has been used, a defendant must prove that

> "(1) [he] was not at fault in creating the violent situation, (2) [he] had a bona fide belief that [he] was in imminent danger of death or great bodily harm and that [his] only means of escape was the use of force, and (3) [he] did not violate any duty to retreat or avoid the danger."

*State v. Goff*, 128 Ohio St.3d 169, 2010-Ohio-6317, ¶ 36, quoting *State v. Thomas*, 77 Ohio St.3d 323, 326 (1997); Former R.C. 2901.05. "[T]he elements of self-defense are cumulative. * * * If the defendant fails to prove *any one* of [the] elements by a preponderance of the evidence he has failed to demonstrate that he acted in self-defense." *State v. Jackson*, 22 Ohio St.3d 281, 284 (1986).

{¶18} The defense of others doctrine affords a person the privilege "to defend family members to the same extent he is entitled to protect himself." *State v. Skinner*, 9th Dist. Lorain No. 06CA009023, 2007-Ohio-5601, ¶ 20, citing *State v. Williford*, 49 Ohio St.3d 247, 249-250 (1990). "A person who asserts that he was defending another * * * 'acts at his own peril * * *.'" *State v. Campbell*, 9th Dist. Lorain No. 97CA006973, 1999 WL 492595, *5 (July 14, 1999), quoting *State v. Wenger*, 58 Ohio St.2d 336, 339 (1979). "The intervenor 'stands in the shoes of the person whom he is aiding, and if the person aided is the one at fault, then the intervenor is not justified in his use of force * * *.'" *Campbell* at *5, quoting *Wenger* at 339.

{¶19} J.B. testified that he led Knight's son-in-law to Danmead Avenue because the son-in-law lied about his identity and posed as someone who was interested in purchasing a dirt bike from the victim. When they arrived at the victim's uncle's house, J.B. parked his car in the street in front of the house, facing toward the dead-end, and the son-in-law parked his truck directly behind him. The victim already had the bike out, and the son-in-law spent time inspecting it and feigning interest. The victim then rode the bike up and down the street a few times to show the son-in-law that it worked. When he finished, he stayed on the bike, facing toward Eastwood Avenue, and once again spoke with the son-in-law.

{¶20} Not long after the victim and the son-in-law resumed their conversation, J.B. noticed a truck turn down Danmead Avenue. He testified that a woman emerged from the truck,

walked toward the bike, and called the police from her cell phone. At the same time, the son-in-law informed the victim that the bike was his and produced a title. J.B. testified that the son-in-law demanded the victim give him the bike, but the victim refused to relinquish it without payment. He recalled that the victim had left the engine running and, as the two men argued, the son-in-law lunged forward and grabbed the bike's clutch to prevent the victim from driving off. As the son-in-law held onto the bike, J.B. saw the victim using his feet to scoot it forward, away from the son-in-law and toward Eastwood Avenue. He also heard the bike "revving up" as the victim engaged the accelerator. Uncomfortable with the turn of events that had occurred, J.B. decided to leave.

{¶21} As J.B. got into his car, he heard a popping noise and saw a man in the distance, holding a gun in the air. The man was standing in the middle of the street in front of J.B.'s car, but several houses down. J.B. testified that he only took notice of the man when he heard the popping noise and realized the man had fired a gun. According to J.B., the victim and the son-in-law either failed to hear the gunshot or chose to ignore it because they kept arguing over the bike. As J.B. drove north toward the dead-end and passed the man in the street, he heard "two more pops," looked in his rearview mirror, and saw the man "standing in the middle of the road in a stance." He then reached the end of the road and waited before circling back toward Eastwood Avenue. As he closed in on the area where he had been parked, J.B. saw people huddled in the street. He testified that the son-in-law emerged from the huddle and told him to stop, but J.B. ignored him. J.B. then noticed the dirt bike lying in the road and swerved around it. He testified that the bike was lying just south of the son-in-law's truck (i.e., closer to Eastwood Avenue).

{¶22} B.W., a close friend of the victim's, also witnessed the events that transpired that evening. He testified that he and the victim were on their way to a bar when the victim received word that someone was interested in purchasing his dirt bike. B.W. drove the victim to the victim's

uncle's house to get the bike and parked his car in the driveway, nearby the uncle's detached garage. He recalled that J.B. and the son-in-law were already there when he and the victim arrived, but acknowledged that he might have been mistaken on that point. He testified that the victim had trouble starting the bike, but eventually succeeded and rode it up and down the street. The victim then returned to his uncle's driveway, turned off the bike, and remained seated while he and the son-in-law discussed a possible sale.

{¶23} B.W. testified that the son-in-law eventually revealed his identity and demanded the return of his bike. The victim still wanted money for the bike, however, and asked to see the bike's title. When the son-in-law produced it, the victim restarted the bike and tried backing up. B.W. testified that the son-in-law grabbed onto the bike to try to stop him, but the victim eventually broke free and accelerated toward Eastwood Avenue. At that point, B.W. testified, the victim almost struck a car and lost control of the bike. He stated that the bike swayed to one side and spun in the opposite direction with the victim just managing to hold on. As the victim struggled with the bike, B.W. saw the son-in-law begin walking toward the victim.

{¶24} According to B.W., after the bike spun, its front end raised up and its front tire lost contact with the ground. He testified that he then heard a gunshot and saw the victim fall to the ground. B.W. scanned the vicinity in the wake of the gunshot and, for the first time, noticed a man standing some distance behind him. He could not estimate how far away the man was, but testified that the man was standing next to a red truck parked on the opposite side of the street. After the man shot the victim, B.W. testified, the man started walking in the victim's direction until he reached a woman that B.W. did not know. B.W. recalled that the woman arrived around the same time as the son-in-law and called the police when the victim and the son-in-law started arguing over the bike. He recalled that she told the police the victim was "being aggressive" when, in fact,

he was not. B.W. could not remember exactly where everyone was standing when the victim was shot, but did remember that no one was standing directly in front of the bike. He confirmed that no one ever threatened the son-in-law or tried to stop him from leaving.

{¶25} The victim's uncle was home when the shooting occurred and saw the events that transpired through his living room window. He testified that he initially looked outside because he heard the victim's dirt bike being driven up and down the street. From his window, he saw the victim stop the bike in front of his house and speak with two white males. The uncle testified that one of the men (i.e., the son-in-law) stood nearby the victim and inspected the bike while the other stood further back. Apart from the victim and the two males, the uncle also noticed a woman standing on the sidewalk in front of his house and B.W. standing in the driveway.

{¶26} The uncle testified that the victim turned off the bike when he began speaking to the son-in-law. Not long after he did so, the two men looked as if they were having a disagreement and the victim went to restart the bike. The uncle testified that the son-in-law tried to grab at the bike's ignition, but the victim pushed his hand away. The victim then accelerated toward Eastwood Avenue, and the uncle heard a popping noise. Though he was unable to identify the source of the noise, it caused him to scan the area. As he did so, he noticed an older white male standing in the middle of the street next to a red truck.

{¶27} The uncle testified that the victim only made it about ten to fifteen feet toward Eastwood Avenue when he "wreck[ed] the bike and [fell]" by two cars that were parked on the opposite side of the street. When he fell, the son-in-law ran toward him and once again tried to grab the bike. The uncle testified that the victim was halfway off the bike, which had spun partway around so that it was facing his house. The uncle stated that it looked like the victim was trying to get away when the bike suddenly "roared up in the air" as if the victim had lost control. He then

saw the older man in the street raise a gun and shoot the victim. According to the uncle, no one was standing in front of the bike when it raised up in the air. He recalled that the son-in-law was standing to the side of the bike, the woman he saw on the sidewalk had remained there, and the shooter had remained standing in the middle of the street.

{¶28} Officer Preston Arroyo arrived on scene within minutes of the shooting. He testified that a group of individuals were huddled around the victim, who was lying in the street, and Knight was standing further down the road next to a red truck. When the officer approached Knight, Knight complied with his commands and informed him that he had set his gun down next to a fire hydrant on the tree lawn. Knight told Officer Arroyo that he had fired the gun to protect his daughter and family because "they were going to get hit with the dirt bike." Upon frisking Knight, Officer Arroyo found a holster and two "speedloaders" on his belt, each of which contained five bullets. The officer explained that "speedloaders" are small pouches that carry additional ammunition and allow for faster reloading once all the rounds in a revolver have been spent.

{¶29} Officer John Mostar processed the scene of the shooting as a member of the crime scene unit. He testified that Knight's red truck was parked across the street and one house to the north of the victim's uncle's house. Officer Mostar collected Knight's gun from the tree lawn next to his truck and found a lockbox for the gun inside the truck. The officer testified that Knight's gun was a .357 revolver with a five-shot capacity. When opening its cylinder, he discovered that the revolver contained three bullets and two spent casings.

{¶30} Detective David Laughlin interviewed several individuals at the police station, including the son-in-law, and confiscated his phone as well as his wife's phone (i.e., Knight's daughter). He testified that the son-in-law's phone history showed that he engaged in a steady

stream of either text messages or phone calls beginning at 5:30 p.m. that day, when he first messaged his wife to inform her that he had found his stolen bike posted for sale online. Detective Laughlin described the son-in-law's efforts to set up a meeting to see the bike, as well as his repeated attempts to involve the police. The detective testified that the son-in-law made multiple calls to the police department that evening, requesting assistance in the recovery of his stolen bike. The son-in-law was informed, however, that no officers were available and that he should not proceed without police assistance.

{¶31} The State introduced into evidence a recording of the 911 call that Knight's daughter placed at 8:55 p.m. when she arrived on Danmead Avenue. Within two minutes of placing the call, the daughter can be heard asking for police assistance because the victim was "starting to get a little aggressive." Less than one minute later, a loud noise from an engine erupts and continues while the daughter remains on the line. Approximately seven seconds later, the daughter gasps and cries out for several seconds before informing the operator that her father shot the victim. The daughter tells the operator that, just before the gunshot, the victim tried to "take off" on the bike and her husband hung on to try to stop him. At no point, does she inform the operator that the victim tried to run her, her husband, or her father over. As the recording continues and the daughter struggles for words, Knight comes onto the line to speak with the operator. Knight informs the operator that the victim "was trying to run into [his] daughter, [his] son-in-law, and [him]" and he had "no choice" but to shoot him.

{¶32} Knight called several witnesses in his defense, including his son-in-law and daughter. The son-in-law testified that he arranged a meeting with the victim in the hopes that a police officer would meet him there. He decided to proceed even when no officers were available, however, because he feared his bike would be gone if he waited. The son-in-law testified that he

updated his wife by text message that evening and asked her and Knight to meet him on Danmead Avenue once he learned the victim was keeping the bike there. According to the son-in-law, he asked Knight to come because he wanted to be able to put the bike in the bed of Knight's truck.

{¶33} The son-in-law testified that, when he arrived on Danmead Avenue, he looked over the bike and the victim rode it up and down the street. The victim then returned and sat on the bike while they chatted. Around the same time, Knight and his daughter arrived, and she called the police. The son-in-law testified that he confronted the victim with the title to the bike, but the victim still wanted him to pay for it. He recalled that the bike was running as they began to argue, and the victim tried to leave. The son-in-law testified that he stepped in front of the bike and grabbed the handlebars to stop the victim. The victim then began revving the engine while the son-in-law cautioned him against pushing the engine beyond its limits. The son-in-law admitted that was not in fear for his life as the victim pushed against him because he understood the victim just wanted to get away. Eventually, he testified, the victim overpowered him, and he was forced to let go of the bike. He then stumbled back, and the victim accelerated toward Eastwood Avenue.

{¶34} The son-in-law testified that the victim "did something and bounced off of a car" before he could reach Eastwood Avenue. The contact spun the bike 90 degrees and knocked the victim partially off its seat. Rather than leave the victim be, the son-in-law advanced toward him as he struggled to regain control. The son-in-law recalled that, as soon as the victim was fully reseated on the bike, "he was in a wheelie." It was unclear to him whether the victim was in control of the bike at that point, but he thought the bike's front tire grazed him as he dove out of the way. He believed Knight fired his gun when he hit the ground, but could not recall his position relative to the victim. He also could not recall where his wife was standing when Knight shot the victim.

Regardless of their exact locations, the son-in-law conceded that he was only in the vicinity of the bike because he chose to walk toward it after the victim tried to get away.

{¶35}  Knight's daughter confirmed that she was on the phone with 911 when the victim began revving the bike and her husband grabbed onto it.  She testified that she tried to grab onto her husband and pull him away, but she was unsuccessful.  Eventually, the victim took off on the bike toward Eastwood Avenue while the daughter remained standing in the street near the front of her husband's truck.  The victim then ran into a parked car on the opposite side of the street and, as a result, the bike fell to one side.  The daughter testified that she lost track of her husband's whereabouts, but, as she watched, the victim climbed back onto the bike and "did a wheelie toward [her] direction."  The daughter testified that, immediately before Knight shot the victim, she felt in danger because the bike was coming toward her.  Yet, she conceded that she never mentioned the bike coming toward her or feeling in danger from it when detectives interviewed her directly after the shooting.

{¶36}  Knight testified in his own defense.  He confirmed that, at the request of his son-in-law, he brought his daughter and his truck to Danmead Avenue so that they could help transport his son-in-law's dirt bike if he succeeded in retrieving it.  He testified that his daughter hopped out of his truck as soon as they arrived, but he drove further down the road, circled, and parked on the opposite side of the street, facing toward Eastwood Avenue.  Knight agreed that he parked about four to five car lengths away from his son-in-law's truck and testified that he remained next to his truck throughout the entire incident.

{¶37}  Though Knight could not hear exactly what his son-in-law and the victim were saying, it soon became clear to him that they were arguing.  He testified that his daughter was standing apart from the group, but exchanged unpleasantries with a man standing by the victim

while she was on the phone with the police. As Knight watched the victim and the son-in-law argue, the victim started the bike and began "popping the clutch, bumping into [the son-in-law] and bouncing back a little bit * * *." Knight could hear the engine revving and testified that he felt "extreme fear" because it appeared the victim was ramming his son-in-law with the bike. Seeking to put an end to the situation, Knight fired a warning shot into the air.

{¶38} Knight denied that he brought his gun with him that evening because he was aware the situation could turn violent. He claimed that he just happened to have it because he bought it a few weeks earlier and had started carrying it with him most of the time. Knight acknowledged that he took a concealed carry course and, during the course, his instructor cautioned the class against firing warning shots. Knight testified that he fired the warning shot out of "desperation" because he wanted the victim to stop what he was doing.

{¶39} Knight testified that the victim rode off when he fired his warning shot, but struck a parked car before he reached Eastwood Avenue. According to Knight, the victim came off the bike when it went down, and the bike shut off. He claimed that the victim then turned around, ran several paces toward him, looked in his direction, returned to the bike, righted it, restarted it, and came toward him "with all the mayhem he could [muster] * * *." At the same time, Knight claimed, he saw his daughter start crossing the street and his son-in-law step out from the front of his (the son-in-law's) truck. Knight testified that he fired a second shot when the bike met up with his son-in-law. He stated that he fired the shot because he thought he and his family would be seriously injured as a result of the victim's "road rage[.]"

{¶40} Although Knight gave detailed testimony about the victim's alleged actions, he also testified that it was dark at the time of the shooting and difficult to see. Moreover, he admitted that his version of the events differed in several respects from the testimony of the other witnesses.

For instance, he acknowledged that no one else recalled his daughter walking into the middle of the street, the bike falling completely to the ground when the victim crashed, or the victim running in his direction before returning to the bike. Knight also conceded that his trial testimony was not completely consistent with the testimony he gave before the grand jury. For example, he acknowledged that he told the grand jury he saw his son-in-law pinned against the grill of his truck by three or four men. Knight indicated that he may have been mistaken about certain details because he was overcome with fear.

{¶41} The defense also called as a witness Dr. Jolie Brams, a forensic psychologist who spent several hours interviewing Knight. Dr. Brams described Knight as an extremely anxious man with no propensity toward violence. She testified that he had led a sheltered life with his wife of 40 years and had given up everything to care for her when she fell ill. When his wife died, Dr. Brams testified, Knight became even more protective of his only child, as she was all that he had. She interpreted his behavior on the evening of the shooting as being consistent with his overwhelming need to protect his daughter. Yet, Dr. Brams acknowledged that Knight had atypical perceptions of the world and a tendency to misinterpret situations due to his anxiety and fear. She also acknowledged that his anxiety raised concerns about his ability to make good judgments in stressful situations.

{¶42} Having reviewed the record, we cannot conclude that the jury clearly lost its way when it found Knight guilty of murder, felony murder, and felonious assault. *See Otten*, 33 Ohio App.3d at 340. The jury heard multiple witnesses testify that the victim tried to leave the scene, but the son-in-law prevented his initial departure and pursued him when he wrecked the bike. The jury also heard multiple witnesses testify that it appeared the bike's front tire only came up off the ground because the victim lost control of the bike. Knight's claim that the victim aggressively ran

toward him on foot before trying to run him and his family over with the bike in a fit of "road rage" was contrary to the other evidence presented at trial. The jury, as the trier of fact, was in the best position to judge his credibility, as well as the credibility of the other witnesses, and to decide which version of the events to believe. *See State v. Shealy*, 9th Dist. Summit No. 29393, 2020-Ohio-1019, ¶ 26. Upon review, the jury reasonably could have rejected Knight's claim of self-defense on the basis that he lacked a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape was the use of force. *See Goff*, 128 Ohio St.3d 169, 2010-Ohio-6317, at ¶ 36, quoting *Thomas*, 77 Ohio St.3d at 326; Former R.C. 2901.05. Likewise, the jury could have rejected his defense of others claim on the basis that his son-in-law either created the violent situation herein or violated a duty to retreat or avoid danger by refusing to let the victim leave and pursuing him when he attempted to do so. *See Goff* at ¶ 36, quoting *Thomas* at 326; *Skinner*, 2007-Ohio-5601, at ¶ 20. Knight has not shown that this is the exceptional case where the evidence weighed heavily against his convictions. *See Hundley*, 2020-Ohio-3775, at ¶ 80. Accordingly, his third assignment of error is overruled.

## ASSIGNMENT OF ERROR I

THE TRIAL COURT COMMITTED PLAIN AND PREJUDICIAL ERROR BY GIVING A JURY INSTRUCTION ON DEFENSE OF PROPERTY THAT WAS UNCALLED FOR BY EITHER PARTY AND WAS UNSUPPORTED BY THE EVIDENCE[.]

{¶43} In his first assignment of error, Knight argues that the trial court committed plain error when it issued the jury an instruction on defense of property. Because the only affirmative defenses he raised were self-defense and defense of others, Knight argues, the court's erroneous instruction misled the jury and resulted in his conviction. We disagree.

{¶44} A defendant who fails to preserve an objection to a trial court's jury instruction is limited to a claim of plain error. *State v. Fry*, 9th Dist. Medina No. 16CA0057-M, 2017-Ohio-

9077, ¶ 20. *See also* Crim.R. 52(B). Plain error exists only where there is a deviation from a legal rule, that is obvious, and that affected the defendant's substantial rights to the extent that it affected the outcome of the trial. *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). "Notice of plain error * * * is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus. "In order to succeed on a plain error claim, the appellant must demonstrate that but for the errors he alleges, the outcome of the trial would clearly have been different." *State v. Thomas*, 9th Dist. Summit No. 26893, 2014-Ohio-2920, ¶ 28, citing *State v. Waddell*, 75 Ohio St.3d 163, 166 (1996).

{¶45} "[J]ury instructions must be reviewed as a whole." *State v. Tyler*, 9th Dist. Summit No. 29225, 2019-Ohio-4661, ¶ 56.

> "If, taken in their entirety, the instructions fairly and correctly state the law applicable to the evidence presented at trial, reversible error will not be found merely on the possibility that the jury may have been misled. Moreover, misstatements and ambiguity in a portion of the instructions will not constitute reversible error unless the instructions are so misleading that they prejudicially affect a substantial right of the complaining party."

*State v. Lollis*, 9th Dist. Summit No. 26607, 2014-Ohio-684, ¶ 35, quoting *Wozniak v. Wozniak*, 90 Ohio App.3d 400, 410 (9th Dist.1993). "A trial court has broad discretion to decide how to fashion jury instructions * * *." *State v. White*, 142 Ohio St.3d 277, 2015-Ohio-492, ¶ 46.

{¶46} At trial, it was undisputed that Knight shot and killed the victim. The only question was whether the shooting was justified, as he claimed to have acted in either self-defense or the defense of others. It was Knight's position that his life and the lives of his daughter and son-in-law were placed in mortal peril when the victim reared up on the dirt bike and came toward them. Meanwhile, it was the State's position that the victim's death was the result of several significant

lapses in judgment on the part of Knight and his son-in-law, both of whom were committed to a vigilante mission to repossess the bike.

{¶47} It is evident from the transcript that some discussion of the jury instructions took place off the record. When court reconvened outside the presence of the jury, the judge indicated that defense counsel had an objection to one of the instructions, which related to defense of property. Defense counsel asked the court to omit any reference to defense of property, as it was not being raised as an affirmative defense and might confuse the jury. The judge then ruled as follows:

> THE COURT: All right.
>
> The jury instructions have been drafted not for defense of property to be an affirmative defense that the Defendant would have to prove.
>
> There is simply a one-line statement in the jury instruction as to what the law is, which is exactly what [defense counsel] just said, that an individual may use some force to defend his or her family's property; however, the force used cannot be likely to cause death or great bodily harm.
>
> That is not in the jury instructions related to the counts in the indictment. It's in kind of the preliminary jury instructions where I am just instructing them as to certain law, so that in case they're thinking about that, and they may be, given this case, or the facts of the case, that they at least have that.
>
> It is not part of any affirmative defense instructions.
>
> So, that's why I'm giving it and I'm giving it in a very limited matter just – actually to avoid any confusion on behalf of the jury.

Consistent with its ruling, in its preliminary instructions on the law, the court instructed the jury: "as a matter of law an individual may use some force to defend his or his family's property; however, the force used cannot be likely to cause death or great bodily harm."

{¶48} Knight concedes that he is limited to a claim of plain error on appeal because his attorney failed to renew his objection to the court's instruction when given an opportunity to do so. *See Knight*, 2019-Ohio-2990, at ¶ 10-11. He argues that the court plainly erred when it issued

its instruction because he never raised defense of property as an affirmative defense and the case "had nothing to do with ejecting a trespasser or, at the moment the shot was fired, repossession of property." According to Knight, the only issue for the jury to decide was whether he was justified in defending himself and his family when the victim tried to run them over. He asserts that the defense of property instruction invited confusion and allowed the State to spin the case as one where he (1) shot the victim during a repossession gone awry, and (2) had no right to defend his son-in-law, due to his son-in-law's decision to recover the bike at all costs. He notes that the State did not request the instruction, but nonetheless used it as "the cornerstone for [its] arguments." Because the instruction was not tailored to the facts of the case and misled the jury, Knight argues, the court committed plain and prejudicial error in issuing it.

{¶49} Assuming without deciding that the trial court erred when it instructed the jury on defense of property, Knight has not shown that its error affected the outcome of his trial. *See Barnes*, 94 Ohio St.3d at 27. The court's instruction that deadly force cannot be used to defend property amounted to a single statement of law that it issued near the end of its preliminary instructions. The instruction was extremely brief and divorced from any of the specific instructions on Knight's charges and affirmative defenses. As to the latter, the court meticulously instructed the jury on the elements of self-defense and defense of others. The jury was instructed that Knight could not avail himself of either defense if he or his son-in-law initiated the confrontation herein or violated a duty to retreat. The jury also was instructed that Knight's defenses were not available if he "used more force than reasonably appear[ed] to be necessary under the circumstances and if the force used [was] so greatly disproportionate to the apparent danger as to show an unreasonable purpose to injury [the victim] * * *." Thus, even if the court should have omitted its defense of

property instruction, the remaining jury instructions, taken as a whole, fairly and accurately stated the applicable law. *See Lollis*, 2014-Ohio-684, at ¶ 35, quoting *Wozniak*, 90 Ohio App.3d at 410.

{¶50} While Knight claims that the court's defense of property instruction formed the "cornerstone" for the State's arguments, the record does not support his claim. The State's argument was that (1) the son-in-law and/or Knight initiated the affray, (2) the son-in-law violated a duty to retreat by chasing after the victim as he attempted to flee, and (3) Knight lacked any reasonable grounds to believe that he, his son-in-law, or his daughter were in immediate danger of death or great bodily harm. The State, therefore, framed its argument within the context of the elements of self-defense and defense of others. The jury heard testimony that Knight and his family ignored the police department's advice to stay away from the victim until the police could assist them. They heard testimony that the son-in-law held onto the bike to prevent the victim from leaving and chased after him when he broke free. They heard testimony that, when the front of the bike lost contact with the ground, it appeared as if the victim had simply lost control. Finally, they heard testimony that neither Knight, nor any of his family members, were directly in harm's way when Knight fired his gun and killed the victim. Upon review, Knight has not shown that, but for the court's solitary instruction on defense of property, the outcome of his trial clearly would have been different. *State v. Thomas*, 2014-Ohio-2920, at ¶ 28, citing *Waddell*, 75 Ohio St.3d at 166. Accordingly, we reject his argument that the court committed plain error when instructing the jury. His first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

THE CONVICTIONS AND SENTENCES VIOLATE OHIO'S CONSTITUTION AND THE UNITED STATES CONSTITUTION DUE TO PREJUDICIAL ERROR OF DENIAL OF THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL.

{¶51}  In his second assignment of error, Knight argues that he received ineffective assistance of trial counsel when his counsel failed to renew his objection to the trial court's jury instruction on defense of property.  We do not agree.

{¶52}  To prevail on a claim of ineffective assistance of counsel, an appellant must show that trial "counsel's performance fell below an objective standard of reasonableness and that prejudice arose from counsel's performance." *State v. Reynolds*, 80 Ohio St.3d 670, 674 (1998), citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  First, he must show that counsel's performance was objectively deficient by producing evidence that counsel acted unreasonably. *State v. Keith*, 79 Ohio St.3d 514, 534 (1997), citing *Strickland* at 687.  Second, he must demonstrate that but for counsel's errors, there is a reasonable probability that the results of the trial would have been different.  *Keith* at 534.  This Court need not address both prongs of the *Strickland* test if the appellant fails to satisfy either prong.  *State v. Ray*, 9th Dist. Summit No. 22459, 2005-Ohio-4941, ¶ 10.

{¶53}  Knight argues that he received ineffective assistance of trial counsel when his attorney failed to renew his objection to the court's jury instruction on defense of property, and therefore, limited Knight to a claim of plain error on appeal.  Yet, we have already determined that the court's instruction did not affect the outcome of his trial.  *See* Discussion of Assignment of Error I, *supra*.  Because Knight cannot demonstrate prejudice as a result of his attorney's performance, his ineffective assistance claim lacks merit.  *See State v. El-Jones*, 9th Dist. Summit No. 26136, 2012-Ohio-4134, ¶ 21, citing *Strickland* at 694; *Ray* at ¶ 10.  His second assignment of error is overruled.

## ASSIGNMENT OF ERROR IV

THE CONVICTIONS AND SENTENCES VIOLATE OHIO'S CONSTITUTION
AND AMENDMENTS TO THE UNITED STATES CONSTITUTION DUE TO

PREJUDICIAL AND PLAIN ERRORS OF DENIAL OF THE EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL.

{¶54} In his fourth assignment of error, Knight argues that he received ineffective assistance of appellate counsel. He argues that he was prejudiced when his counsel failed to present this Court with meaningful arguments that (1) the trial court committed plain error in instructing the jury, (2) he received ineffective assistance of trial counsel, and (3) there was insufficient evidence to convict him under the burden-shifting framework that ought to have retroactively applied to his claim of self-defense. For the following reasons, we reject his argument.

{¶55} As previously noted, App.R. 26(B)(9) instructs appellate courts to review claims of ineffective assistance of appellate counsel under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *See Graves*, 2011-Ohio-5997, at ¶ 9. "To show ineffective assistance of appellate counsel, [Knight] must prove that his counsel was 'deficient for failing to raise the issues he now presents and that there was a reasonable probability of success had he presented those claims on appeal.'" *State v. Powell*, 9th Dist. Lorain No. 12CA010284, 2017-Ohio-4030, ¶ 26, quoting *State v. Sheppard*, 91 Ohio St.3d 329, 329 (2001).

{¶56} This Court has reviewed the merits of each of the underlying arguments Knight has alleged in support of his claim of ineffective assistance of appellate counsel. Our resolution of those arguments demonstrates that Knight would not have been successful, had his first appellate attorney adequately raised those issues on direct appeal. "Since this Court has reopened [Knight's] appeal and addressed his additional arguments on the merits, he has received an adequate remedy for any alleged error by counsel and cannot demonstrate prejudice." *Powell* at ¶ 30. As such, his fourth assignment of error is overruled.

26

III.

**{¶57}** Knight's assignments of error are overruled.  Pursuant to App.R. 26(B), this Court confirms its prior decision in *State v. Knight*, 9th Dist. Summit No. 29057, 2019-Ohio-2990.  The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution.  A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run.  App.R. 22(C).  The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

HENSAL, J.
SCHAFER, J.
CONCUR.

APPEARANCES:

MARK H. LUDWIG, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and JACQUENETTE S. CORGAN, Assistant Prosecuting Attorney, for Appellee.