[Cite as *State v. Moss*, 2022-Ohio-1833.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| STATE OF OHIO | C.A. No. 30005 |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| HEDY MOSS | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No. CR 18 02 0432 |

## DECISION AND JOURNAL ENTRY

Dated: June 1, 2022

TEODOSIO, Presiding Judge.

{¶1} Defendant-Appellant, Hedy Moss, appeals from the judgment of the Summit County Court of Common Pleas. This Court affirms.

## I.

{¶2} Sometime between 4:00 a.m. and 5:00 a.m., Ms. Moss shot two men in their home. One of the men, E.S., died as a result of the incident, but the second man, J.M., survived. According to J.M., Ms. Moss became angry and shot him and E.S. when E.S. refused to answer questions she had about her stolen property. According to Ms. Moss, she shot the men because E.S. attacked her, she believed J.M. was retrieving a weapon, and she feared for her life. The police began looking for Ms. Moss not long after the shooting and found her walking down a street about three miles from the scene. Ms. Moss initially lied about her identity and never indicated that she had shot anyone in self-defense. The police found a bag of bullets in her coat pocket and loose bullets inside a bookbag she was carrying. Upon searching the immediate vicinity and

following footprints in the snow, the police also found a handgun lying on top of compacted snow inside a nearby sewer. Ballistics testing confirmed that the gun had been used to shoot E.S. and J.M.

{¶3} A grand jury indicted Ms. Moss on multiple counts. With respect to E.S., she was charged with murder, felony murder, and felonious assault. With respect to J.M., she was charged with attempted murder and felonious assault. She also was indicted on counts of having a weapon under disability and tampering with evidence. She pleaded not guilty on all counts, and the matter proceeded to trial.

{¶4} At trial, Ms. Moss admitted she shot E.S. and J.M. but claimed she did so in self-defense. The jury found her not guilty of attempted murder but guilty of having a weapon under disability, tampering with evidence, and felonious assault as to J.M. The jury was unable to reach a verdict on her remaining counts, so the trial court declared a mistrial on those counts.

{¶5} A second jury trial was later held on the counts for which no verdict was returned. At the conclusion of the second trial, the jury found Ms. Moss not guilty of murder but guilty of felony murder and felonious assault as to E.S. The trial court merged the latter counts as allied offenses of similar import and sentenced Ms. Moss to a total of 21 years to life in prison.

{¶6} Ms. Moss now appeals from her convictions and raises four assignments of error for this Court's review. To facilitate our review, we rearrange her assignments of error.

II.

**ASSIGNMENT OF ERROR IV**

THE VERDICT OF THE TRIAL COURT CONVICTING APPELLANT OF FELONIOUS ASSAULT IN THE FIRST TRIAL WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AS THE DEFENSE PROVED THE AFFIRMATIVE DEFENSE OF SELF DEFENSE BY A PREPONDERANCE OF THE EVIDENCE[.]

{¶7} In her fourth assignment of error, Ms. Moss argues that her conviction for felonious assault with respect to J.M. is against the manifest weight of the evidence. Specifically, she argues that the jury lost its way when it rejected her claim of self-defense. We do not agree.

{¶8} A challenge to the manifest weight of the evidence concerns the State's burden of persuasion. *State v. Klafczynski*, 9th Dist. Medina No. 18CA0084-M, 2020-Ohio-3221, ¶ 7. This Court has stated:

> In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). "[W]hen reversing a conviction on the basis that it was against the manifest weight of the evidence, an appellate court sits as a 'thirteenth juror,' and disagrees with the factfinder's resolution of the conflicting testimony." *State v. Tucker*, 9th Dist. Medina No. 06CA0035-M, 2006-Ohio-6914, ¶ 5. This discretionary power "'should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). *See also Otten* at 340.

{¶9} The felonious assault statute prohibits any person from "knowingly * * * [causing] or attempt[ing] to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance." R.C. 2903.11(A)(2). Ms. Moss took the position that she was not guilty of felonious assault because she shot J.M. in self-defense. At the time of her first trial, self-defense was an affirmative defense that a defendant had to prove by a preponderance of the evidence. *See State v. Robinson*, 9th Dist. Lorain No. 19CA011495, 2020-Ohio-4502, ¶ 14. *See also State v. Brown*, 9th Dist. Wayne No. 19AP0004, 2020-Ohio-529, ¶ 23 (former R.C. 2901.05(A) applies when

4

offense at issue occurred before March 28, 2019).  Thus, it was Ms. Moss' burden to prove that "(1) [she] was not at fault in creating the violent situation, (2) [she] had a bona fide belief that she was in imminent danger of death or great bodily harm and that her only means of escape was the use of [deadly] force, and (3) [she] did not violate any duty to retreat or avoid the danger." *State v. Thomas*, 77 Ohio St.3d 323, 326 (1997).  Her failure to prove any one of those cumulative elements would be fatal to her claim of self-defense.  *See State v. Knight*, 9th Dist. Summit No. 29057, 2020-Ohio-6709, ¶ 17, quoting *State v. Jackson*, 22 Ohio St.3d 281, 284 (1986).

{¶10}  J.M. testified that he shared a five-bedroom house with E.S., a close friend who was like a brother.  The two men kept separate, adjoining bedrooms on the second floor of the house. J.M. testified that he was relaxing on his bed, dozing with the television on, when someone pounded on his bedroom door just after 4:00 a.m.  He testified that the noise startled him awake and he demanded to know who was knocking.  According to J.M., Ms. Moss identified herself as the person at the door and came into his room.  She indicated that E.S. had let her into the house and sat down on J.M.'s bed.  J.M. indicated that he was familiar with Ms. Moss because they had known each other for over thirty years.

{¶11}  J.M. testified that Ms. Moss had spent time at the house the previous month and, on that occasion, a male acquaintance of theirs had stolen a gun from her.  When Ms. Moss came into J.M.'s bedroom, she began asking him questions about the man who had stolen her gun.  J.M. indicated that the conversation upset him because he was tired and did not appreciate being disturbed at that hour.  Although he let Ms. Moss know that he was not interested in continuing their conversation, Ms. Moss persisted and asked J.M. if he thought E.S. was asleep.  J.M. testified that he called out to E.S. and, when E.S. responded, Ms. Moss left the room, retrieved E.S., and came back into J.M.'s bedroom with E.S.

{¶12}  J.M. testified that Ms. Moss and E.S. sat down in chairs by his bedroom door, and he stood up to open his bedroom window.  Ms. Moss began questioning E.S. about her stolen gun, but E.S. was dismissive of her questions and indicated that he did not have time to speak with her.  According to J.M., when E.S. stood to leave, Ms. Moss got up and said "For real?  For real, n***er?" before pulling a gun from her pocket and shooting E.S. in the head.  J.M. called out to ask Ms. Moss what she had done, but Ms. Moss responded by turning the gun on him and firing.  J.M. testified that he hit the floor by the window and began rolling around to avoid being struck in the head as Ms. Moss continued to fire the gun.  When he heard a click and understood the gun's chamber was empty, J.M. kicked the screen out of his bedroom window and jumped from the second floor.  As a result of the incident, he sustained gunshot wounds to his arm.  He testified that he ran to a neighbor's house for help once he saw Ms. Moss leave in her vehicle, but ultimately returned to his house and called 911 himself.

{¶13}  J.M. denied that either he or E.S. ever attacked Ms. Moss.  He testified that there was never any type of altercation or physical contact between himself, E.S., and Ms. Moss.  According to J.M., any noises anyone may have heard coming from his bedroom must have come from E.S. hitting the floor when he was shot.

{¶14}  Two officers who testified for the State spoke with J.M. shortly after the shooting.  Sergeant Eric McDonald was one of the first to arrive on scene and testified that he spotted a blood trail outside that led him into J.M.'s house, up the stairs, and straight to J.M.  He testified that J.M. immediately identified Ms. Moss as the individual who shot him and was able to give the police a description of her car.  J.M. also spoke with Officer Michael Pasternak, who accompanied J.M. when he was transported to the hospital by ambulance.  Officer Pasternak testified that J.M. was

moaning in pain but said Ms. Moss had shot him. J.M. told Officer Pasternak that Ms. Moss "had come over to the house and that she accused someone in his house of stealing a gun from her."

{¶15} The State set forth evidence that, apart from J.M., E.S., and Ms. Moss, one other individual was present in the house at the time of the shooting. E.S. had a female friend over and, when the shooting occurred, she was resting in his bed. The female testified that she was sick with a bad cold and sound asleep when Ms. Moss came over. She did not recall hearing a knock on the front or side door of the house and could not say who let Ms. Moss inside. The female testified that she woke up when Ms. Moss came to E.S.' bedroom door to get E.S. and E.S. left with her. The female immediately fell asleep again when they left and slept until she was awoken by a noise that sounded "like knocking against the wall * * *." Although she said it sounded like a "fighting" sound, she denied ever hearing any type of yelling or arguing. She testified that, after she was awoken by the noise of knocking against the wall, she heard three gunshots and kept still because she was afraid. Not long after that, Ms. Moss cracked open the bedroom door while holding a gun, said they had to leave the house, and ran off.

{¶16} Following the shooting, the police began searching for Ms. Moss, and all available officers were instructed to check the area where the police believed she was heading. One of the officers who responded to the call, Officer Brandon Collins, spotted a female walking alone in that area and stopped to ask her name. Officer Collins testified that the female lied about her name and social security number before admitting her name was Hedy Moss. Officer Amanda Golson, a female officer who arrived on scene, searched Ms. Moss and found a plastic bag of bullets inside her coat pocket as well as loose bullets inside a backpack she was carrying. Officer Collins testified that the discovery of the bullets led him to believe a gun might be nearby, so he began

looking around the area. Inside a nearby sewer, he spotted a handgun. Subsequent ballistics testing confirmed that the gun was operable and had been used to shoot J.M. and E.S.

{¶17} Officer Collins testified that Ms. Moss did not appear to be in any type of distress when he spoke with her. During their exchange, she never said she had been attacked or had been forced to shoot others in self-defense. Likewise, when Detective Ronald Garey interviewed Ms. Moss at the police station, she never indicated that she shot E.S. or J.M. in self-defense. Detective Garey described Ms. Moss as "standoffish" and uninterested in speaking with him. He denied that she ever complained of injuries or appeared to have any injuries on her body. He testified that the first time he learned Ms. Moss was claiming self-defense was during opening statements at trial.

{¶18} Ms. Moss testified in her own defense. She admitted she was addicted to crack cocaine at the time of this incident and had used crack about an hour before she arrived at J.M. and E.S.' house. She testified that J.M. sometimes sold her drugs and she came to the house around 4:00 a.m. because she wanted to buy more crack cocaine. While she was not afraid to enter the house and meet with J.M., Ms. Moss admitted that she brought a loaded gun into the house. She testified that she knew J.M. and E.S. kept different weapons all over the house, including a machete near J.M.'s bed, because fights frequently broke out there.

{¶19} Ms. Moss agreed that E.S. let her into the house and that she initially went into J.M.'s bedroom alone. Yet, she denied ever asking J.M. or E.S. about a stolen gun. She claimed that she asked J.M. to procure crack cocaine for her and, during their conversation, J.M. appeared agitated. Because neither she, nor J.M. had a working cell phone with them, J.M. ultimately told Ms. Moss to go over to E.S.' room and ask to use his phone. Ms. Moss then walked to the next room and asked E.S. to join her in J.M.'s room.

{¶20} Ms. Moss testified that E.S. came with her into J.M.'s room and sat down near the door. According to Ms. Moss, J.M. and E.S. began talking about her when J.M. asked to use E.S.' cell phone. The two men talked about how Ms. Moss had come to the house at an inconvenient time with no cell phone and only a small amount of money. At some point during that exchange, Ms. Moss testified, E.S. asked J.M. why he kept "attracting these broke ass bitches," and Ms. Moss responded that she was "not a bitch." She testified that E.S. then directly insulted her, but she did not react because she did not want any problems. When E.S. continued to rant, Ms. Moss decided it was best if she left. As she tried to walk out of the bedroom, however, E.S. pushed her back and blocked the doorway.

{¶21} Ms. Moss testified that she tried to leave again, but E.S. shoved her backward. When she told him not to put his hands on her, he used a punching motion to connect with her chest and shoved her into the wall. Ms. Moss then "called him a punk bitch[,]" and E.S. came close to her face. She testified that J.M. was somewhere on the other side of the room "ranting and raving" while she focused on E.S. As she tried kicking E.S. and slapping him to get away, E.S. hit her in the stomach and grabbed her by the neck. Ms. Moss then heard J.M. say, "Oh, I got something for that." Ms. Moss understood that statement to mean J.M. was retrieving a weapon. That statement, in conjunction with E.S.' behavior, caused Ms. Moss to fear for her life and to remove her gun from her pocket. She testified that she shot in E.S.' direction first and then shot toward J.M. before grabbing the door and running out. Ms. Moss acknowledged that she stopped at E.S.' room to tell the female inside to leave.

{¶22} Ms. Moss conceded that she initially lied to the police about her name and tried to dispose of her gun by dropping it into a sewer. She testified that she did those things and never told the police she acted in self-defense because she feared they would not believe her. The defense

claimed that the noise the female in E.S.' room heard before gunshots rang out was the sound of Ms. Moss being shoved into the wall by E.S. The defense also elicited testimony tending to show that J.M. had a violent temper.

{¶23} When testifying, J.M. acknowledged that he had a prior record, including convictions for felony offenses of violence. J.M.'s neighbor testified that he had to call 911 multiple times in the past to report fights and other problems at J.M. and E.S.' house. The neighbor stated that J.M. was always yelling at someone and "didn't seem to care who he was fighting." The detective who interviewed Ms. Moss at the station also described J.M. as "a difficult person." Even so, the police did not observe any weapons when they examined J.M.'s bedroom and collected evidence in the wake of the shooting. The police found several casings in the room, which had been fired from Ms. Moss' gun, a bullet that appeared to have struck a spot by the window, and blood along the window from which J.M. said he had jumped after Ms. Moss shot him.

{¶24} Ms. Moss argues that the jury lost its way when it failed to conclude that she shot J.M. in self-defense. She points to the evidence that J.M. had a violent temper and a record of felony offenses of violence. She also notes that her testimony about being pushed into a wall by E.S. was consistent with the testimony of E.S.' female friend, who said she was awoken by the sound of fighting and "knocking against the wall" before she heard gunshots. According to Ms. Moss, the jury returned inconsistent verdicts when it convicted her of felonious assault but acquitted her of attempted murder and hung on other charges. Because the weight of the evidence tends to show she acted in self-defense, Ms. Moss argues, the jury lost its way when it found her guilty of felonious assault.

{¶25} Having reviewed the record, we cannot conclude that the jury clearly lost its way and created a manifest miscarriage of justice when it rejected Ms. Moss' claim of self-defense and found her guilty of felonious assault as to J.M. *See Otten*, 33 Ohio App.3d at 340. While the jury found Ms. Moss not guilty of attempted murder and hung on other counts, "juries are not required to reach consistent verdicts between separate counts." *State v. Singh*, 9th Dist. Summit No. 28819, 2018-Ohio-3473, ¶ 15. The jury heard testimony that Ms. Moss, having used crack cocaine an hour earlier, came to the home of E.S. and J.M. just after 4:00 a.m. with a loaded gun and shot E.S. and J.M. based solely on their refusal to answer her questions about a stolen gun. While Ms. Moss testified to a different version of the events than J.M., "[a] verdict is not against the manifest weight of the evidence because the finder of fact chose to believe the State's witnesses rather than the defendant's version of the events." *State v. Martinez*, 9th Dist. Wayne No. 12CA0054, 2013-Ohio-3189, ¶ 16. The jury heard testimony that Ms. Moss lied about her identity when an officer first spoke with her, hid her gun in a nearby sewer, and never gave the police any indication that she shot J.M. in self-defense. Although her testimony that E.S. pushed her into the wall was consistent with the testimony of the female who heard "knocking against the wall" before the shooting, the female denied that she heard any type of arguing coming from inside the room. That portion of her testimony was inconsistent with Ms. Moss' claim that she and E.S. were exchanging unpleasantries while J.M. was "ranting and raving." Ms. Moss, J.M., and E.S. were the only people inside J.M.'s bedroom when the shooting occurred. The jury was in the best position to assess the credibility of the testifying witnesses and decide whether Ms. Moss or J.M. was telling the truth. *See State v. Brown*, 9th Dist. Lorain No. 20CA011618, 2021-Ohio-2540, ¶ 48. Upon review, Ms. Moss has not shown that this is the exceptional case where the jury lost its way by rejecting her

claim of self-defense and convicting her. *See Otten* at 340. As such, her fourth assignment of error is overruled.

## ASSIGNMENT OF ERROR III

APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL DURING PLEA NEGOTIATIONS[.]

**{¶26}** In her third assignment of error, Ms. Moss argues that she received ineffective assistance of counsel because her counsel failed to ensure that she rejected the State's plea offer on the record before the start of her second trial. For the following reasons, this Court rejects her argument.

**{¶27}** "[I]n Ohio, a properly licensed attorney is presumed competent." *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, ¶ 62. To prove ineffective assistance of counsel, one must establish that: (1) her counsel's performance was deficient, and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Counsel's performance is deficient if it falls below an objective standard of reasonable representation. *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph two of the syllabus. Prejudice exists if there is "a reasonable probability that, but for counsel's errors, the outcome of the proceeding would have been different." *State v. Sowell*, 148 Ohio St.3d 554, 2016-Ohio-8025, ¶ 138. "To show prejudice from ineffective assistance of counsel where a plea offer has * * * been rejected because of counsel's deficient performance, defendants must demonstrate a reasonable probability they would have accepted the earlier plea offer had they been afforded effective assistance of counsel." *State v. Fry*, 9th Dist. Summit No. 26121, 2012-Ohio-2602, ¶ 19, quoting *Missouri v. Frye*, 566 U.S. 134, 147 (2012).

**{¶28}** At the beginning of the second trial, the trial court inquired as to whether there was any plea offer to be read into the record. The State indicated that no formal offer had been made

because it was the State's understanding that Ms. Moss was unwilling to accept any plea that could lead to an additional prison term. Defense counsel interjected that plea negotiations had been limited because the State had yet to offer any plea that did not include a life tail. Following a short discussion, the trial court ordered a recess to allow the parties to speak off the record and to determine if a plea might be possible. When the parties came back before the court, the State informed the court that the matter could not be resolved. Defense counsel agreed and responded as follows:

> Just for purposes of the record, there was an offer of amending these charges to a manslaughter charge, therefore removing the potential life sentence if found guilty, then with certain numbers, affixed within which potentially to negotiate a sentence. Myself and [my co-counsel] have [spoken] to Ms. Moss about that. We talked about the pros and cons of her exposure. At this point in time, we would like to go forward and pick a jury.

The trial court did not speak directly with Ms. Moss about the plea offer. Instead, jury selection commenced, and the matter proceeded to trial.

{¶29} Ms. Moss argues that she received ineffective assistance of counsel because her counsel did not ensure that she rejected the State's plea offer on the record. According to Ms. Moss, there is no record as to whether she understood the offer, whether she appreciated the difference in the potential penalties she might receive, whether she received advice about accepting the offer, and whether she formally rejected it. She argues that her counsel's failure to ensure those matters were discussed on the record deprived her of the opportunity to contest any issues involving her plea offer on direct appeal and limited her to a claim of post-conviction relief.

{¶30} Even assuming defense counsel engaged in deficient performance by not ensuring the trial court spoke with Ms. Moss about any plea offer on the record, Ms. Moss has not demonstrated resulting prejudice. *See Sowell*, 148 Ohio St.3d 554, 2016-Ohio-8025, at ¶ 138. Defense counsel described the parameters of the plea offer on the record, informed the court that

Ms. Moss had been advised of the pros and cons of that offer, and indicated that the defense wished to proceed to trial. Any evidence Ms. Moss would need to refute those representations would be evidence outside the record, and thus, not suitable for direct appeal. *See State v. Dukes*, 9th Dist. Summit No. 27966, 2019-Ohio-2893, ¶ 39. Moreover, Ms. Moss has made no attempt to argue that, but for the deficient performance of her counsel, she would have accepted the State's plea offer. *See Fry*, 2012-Ohio-2602, at ¶ 19, quoting *Frye*, 566 U.S. at 147. Her argument is that the actions of her counsel limited her to a claim of post-conviction relief, not that the outcome of the proceedings would have been different if she had spoken directly with the trial court about the offer. She essentially asks this Court to conclude that her attorney's failure to insist the trial court review her plea with her on the record was per se ineffective assistance of counsel, regardless of whether she still would have declined the plea. Yet, ineffective assistance of counsel only lies if, "but for counsel's errors, the outcome of the proceeding would have been different." *Sowell*, 148 Ohio St.3d 554, 2016-Ohio-8025, at ¶ 138. Because Ms. Moss has not shown that she sustained prejudice as a result of the actions of her counsel, we reject her claim of ineffective assistance. Thus, her third assignment of error is overruled.

## ASSIGNMENT OF ERROR I

> THE VERDICT OF THE TRIAL COURT CONVICTING APPELLANT OF MURDER AND FELONIOUS ASSAULT IN THE SECOND TRIAL WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AS THE STATE FAILED TO PROVE BEYOND A REASONABLE DOUBT THAT APPELLANT WAS NOT ACTING IN SELF DEFENSE[.]

{¶31} In her first assignment of error, Ms. Moss argues that her convictions for felony murder and felonious assault with respect to E.S. are against the manifest weight of the evidence.

Specifically, she argues that the jury lost its way when it found that she did not act in self-defense. We do not agree.

{¶32}  Because this assignment of error presents us with a manifest weight challenge, we incorporate the standard of review set forth in our discussion of Ms. Moss' fourth assignment of error. *See* Discussion, *supra*.  Thus, we review the record to determine whether "the trier of fact clearly lost its way and created such a manifest miscarriage of justice that [Ms. Moss'] conviction[s] must be reversed and a new trial ordered." *Otten*, 33 Ohio App.3d at 340.  Ms. Moss' felony murder conviction required the State to prove that she caused E.S.' death as a proximate result of committing felonious assault.  *See* R.C. 2903.02(B).  Her felonious assault conviction required the State to prove that she knowingly caused physical harm to E.S. "by means of a deadly weapon or dangerous ordnance."  R.C. 2903.11(A)(2).  As with J.M., Ms. Moss took the position that she was not guilty of either crime because she shot E.S. in self-defense.

{¶33}  By the time a second jury trial was held on the counts for which no verdict against Ms. Moss had been returned, amendments to the self-defense statute had taken effect.  *See* 2019 Am.Sub.H.B. No. 228.  "The amendments reallocated the burden of proof in self-defense cases * * *." *State v. Knight*, 9th Dist. Summit No. 29057, 2020-Ohio-6709, ¶ 11.  Under the amended statute, if "evidence presented at trial [] tends to support that the defendant acted in self-defense, the State must disprove one of the elements of self-defense beyond a reasonable doubt." *State v. Williams*, 9th Dist. Summit No. 29444, 2020-Ohio-3269, ¶ 10.  Accordingly, if evidence presented in the second trial tended to support Ms. Moss' claim of self-defense, it was the State's burden to prove beyond a reasonable doubt that she "(1) was at fault in creating the situation giving rise to the affray, OR (2) did not have a bona fide belief that [she] was in imminent danger of death or great bodily harm for which the use of deadly force was [her] only means of escape, OR (3) did

violate a duty to retreat or avoid the danger." *State v. Pittman*, 9th Dist. Summit No. 29705, 2021-Ohio-1051, ¶ 17, quoting *State v. Carney*, 10th Dist. Franklin No. 19AP-402, 2020-Ohio-2691, ¶ 31.

{¶34} Much of the testimony the State presented at the second trial mirrored the evidence it presented at the first trial. J.M. once again testified that Ms. Moss knocked on his bedroom door just after 4:00 a.m., brought E.S. into the room shortly thereafter, and shot E.S. in the head when he refused to answer questions about her stolen gun. J.M. confirmed that E.S. never physically attacked Ms. Moss or threatened her in any manner. According to his testimony, Ms. Moss shot E.S. absent any provocation.

{¶35} Officer Collins and Officer Golson once again testified regarding their interactions with Ms. Moss in the wake of the shooting. Officer Collins testified that Ms. Moss initially acted "real evasive" and lied about her name and social security number. He indicated that she never asked for help or said she had been attacked. When he specifically asked Ms. Moss whether she had a gun, she told him she did not. Officer Golson then searched Ms. Moss and found a bag of bullets in her coat pocket. Officer Golson testified that Ms. Moss appeared "very calm," said the bullets belonged to her ex-boyfriend, and claimed she had come from a party over by Summit Lake. Ms. Moss said nothing about E.S. or J.M., but, after Officer Golson found the bullets, Officer Collins searched the area for a gun. There was testimony that he followed footprints in the snow and, inside a nearby sewer, found the gun Ms. Moss had used to shoot E.S. and J.M.

{¶36} E.S.' female friend was declared unavailable to testify at the second trial, as neither the State nor the defense could locate her. Because she was unavailable, the parties agreed to introduce her testimony from the first trial. Pursuant to that agreement, the jury was instructed

that the female had been questioned in a prior proceeding, and her prior testimony was read into the record.

{¶37}  Ms. Moss once again testified in her own defense at the second trial.  In doing so, certain details of her testimony changed.  She still testified that she used crack cocaine about an hour before she went to E.S. and J.M.'s house and that she went there to buy more crack.  Regarding the loaded gun she brought into the house, however, Ms. Moss testified that she did not choose to bring the gun into the house.  It was her testimony that the gun just happened to be in her pocket because she grabbed her ex-boyfriend's coat before she went out that evening.

{¶38}  Ms. Moss testified that, after she brought E.S. into J.M.'s room so that J.M. could borrow his cell phone, E.S. began making comments about her lack of funds and the type of company J.M. kept.  She still testified that she tried to leave the room, and E.S. repeatedly prevented her from doing so by pushing her and pinning her against the wall.  Her account included additional details, however, wherein she described how E.S. choked her, how it became difficult for her to breath, how she tried to knee him in the groin multiple times, and how she almost escaped before he caught her by her jacket and held on.  Ms. Moss testified that she shot E.S. to escape and, as she went for the door, she saw J.M. coming across the bed for her.  She testified that she did not see a specific weapon but thought there was something in J.M.'s hand, so she shot at him several times before running from the room.  Ms. Moss testified that she shot the two men because she feared for her life.  She acknowledged, however, that she never told the police she acted in self-defense, she initially lied to them about her identity, and she tried to dispose of the gun involved by dropping it into a sewer.

{¶39}  Apart from testifying to her version of the events, Ms. Moss also elicited testimony tending to show that J.M. had a violent temper.  There was evidence about his prior convictions

for felony offenses of violence, the number of times the police had been called to the house for disturbances and fights, and his tendency to be hostile or fight with others around him. Yet, there was limited testimony about E.S.' disposition, and Ms. Moss specifically testified that she never had much interaction with him.

{¶40} Ms. Moss argues that the jury lost its way when it convicted her because there was evidence tending to show she acted in self-defense and the State failed to disprove one or more self-defense elements beyond a reasonable doubt. She argues that the evidence showed E.S. started the confrontation that occurred, prevented her from leaving the bedroom, and placed her in imminent fear for her life by assaulting her. She further argues that her fear was reasonable, as there was evidence the police had to respond to the house on several occasions, there were weapons inside the house, and J.M. had a history of violence. Because there was no opportunity for her safe retreat, Ms. Moss argues, she was justified in shooting E.S. in self-defense.

{¶41} Having reviewed the record, we cannot conclude that the jury clearly lost its way and created a manifest miscarriage of justice when it found that Ms. Moss did not act in self-defense and found her guilty of felony murder and felonious assault as to E.S. *See Otten*, 33 Ohio App.3d at 340. The jury heard testimony that Ms. Moss, having used crack cocaine an hour earlier, came to the home of E.S. and J.M. just after 4:00 a.m. with a loaded gun and shot E.S. and J.M. based solely on their refusal to answer her questions about a stolen gun. While there was some evidence tending to show she acted in self-defense, "[a] verdict is not against the manifest weight of the evidence because the finder of fact chose to believe the State's witnesses rather than the defendant's version of the events." *Martinez*, 2013-Ohio-3189, at ¶ 16. The jury heard testimony that Ms. Moss lied about her identity when an officer first spoke with her, hid her gun in a nearby sewer, and never gave the police any indication that she shot E.S. in self-defense. The jury

reasonably could have concluded that J.M. was telling the truth and that Ms. Moss shot E.S. absent any provocation. *See Brown*, 2021-Ohio-2540, at ¶ 48 (recognizing that the trier of fact is the best judge of credibility). Given that conclusion, the jury also reasonably could have determined that the State proved Ms. Moss was at fault in creating the situation, lacked a bona fide belief that she was in mortal peril and that deadly force was her only means of escape, or violated a duty to retreat or avoid the danger. *See Pittman*, 2021-Ohio-1051, at ¶ 17, quoting *Carney*, 2020-Ohio-2691, at ¶ 31. Upon review, Ms. Moss has not shown that this is the exceptional case where the jury lost its way by finding that she did not act in self-defense and convicting her. *See Otten* at 340. As such, her first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR A MISTRIAL BASED ON PROSECUTORIAL MISCONDUCT[.]

**{¶42}** In her second assignment of error, Ms. Moss argues that the trial court erred when it denied her motion for a mistrial based on prosecutorial misconduct. She argues that the prosecutor deprived her of a fair second trial when he improperly referenced her first trial during cross-examination and closing argument. For the following reasons, we reject her argument.

**{¶43}** "[T]he trial judge is in the best position to determine whether the declaration of a mistrial is warranted under the circumstances as they have arisen in the courtroom." *State v. Edwards*, 9th Dist. Summit No. 28164, 2017-Ohio-7231, ¶ 12. As such, an appellate court "reviews a trial court's denial of a motion for mistrial for an abuse of discretion." *State v. Hickman*, 9th Dist. Summit No. 27321, 2015-Ohio-4668, ¶ 27. An abuse of discretion implies that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶44} When a defendant moves for a mistrial based on prosecutorial misconduct, the trial court must determine whether "the prosecutor's actions were improper, and, if so, whether the defendant's substantial rights were actually prejudiced." *State v. Dukles*, 9th Dist. Medina No. 12CA0100-M, 2013-Ohio-5263, ¶ 33. "[A] judgment may only be reversed for prosecutorial misconduct when the improper conduct deprives the defendant of a fair trial." *State v. Knight*, 9th Dist. Lorain No. 03CA008239, 2004-Ohio-1227, ¶ 6. "The defendant must show that, but for the prosecutor's misconduct, the trier of fact would not have convicted [her]." *Dukles* at ¶ 33. Because the "touchstone of the analysis" is the fairness of the trial and not the culpability of the prosecutor, *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, ¶ 140, "[a] reviewing court [must] consider the trial record as a whole, and [must] ignore harmless errors 'including most constitutional violations,'" *Knight* at ¶ 6, quoting *State v. Lott*, 51 Ohio St.3d 160, 166 (1990).

{¶45} When testifying at the second trial, Ms. Moss changed certain portions of her testimony from the previous trial and added details to which she previously had not testified. The prosecutor repeatedly pointed out those inconsistencies on cross-examination. In doing so, the prosecutor almost uniformly referred to Ms. Moss having testified in a "previous proceeding" or "prior proceeding." Only once did the prosecutor slip and use the phrase "the prior trial," at which point the defense objected and the prosecutor pledged to be more careful. The prosecutor referred to the "prior proceeding" in closing argument, wherein he argued that Ms. Moss had changed certain aspects of her testimony to benefit her defense. Ms. Moss then moved for a mistrial, claiming that the prosecutor's argument, when combined with his earlier reference to "the prior trial," had deprived her of a fair trial. After hearing arguments from both parties, the trial court denied the motion for a mistrial.

**{¶46}** Ms. Moss argues that the trial court erred when it overruled her motion for a mistrial. She argues that, by repeatedly referencing the first trial, the prosecutor deprived her of a fair second trial. According to Ms. Moss, the prosecutor's actions "place[d] unanswerable questions in the mind of the jury as to what previously took place, if something [was] being hidden from them, and whether decisions [had] already been made on the evidence presented."

**{¶47}** Having reviewed the entire record, we cannot conclude that the trial court abused its discretion when it denied Ms. Moss' motion for a mistrial. *See Hickman*, 2015-Ohio-4668, at ¶ 27. First, "a defendant's testimony at a former trial is admissible in evidence against [her] in later proceedings." *Harrison v. United States*, 392 U.S. 219, 222 (1968). Ms. Moss has made no attempt to explain why it was improper for the State to impeach her with her prior testimony, and this Court will not engage in an analysis on her behalf. *See* App.R. 16(A)(7). Second, the jury was aware that a prior proceeding had occurred before the prosecutor began cross-examining Ms. Moss about her prior testimony. When E.S.' female friend was declared unavailable to testify, the trial court specifically instructed the jury that she had been questioned in "a prior proceeding" and that a transcript of her testimony would be read into the record. Further, when responding to questions about DNA testing near the beginning of cross-examination, Ms. Moss specifically stated: "There was DNA that was tested last trial." She made that statement before the prosecutor mistakenly used the phrase "the prior trial" and before he asked Ms. Moss any questions about her prior testimony. Even if this Court were to assume the prosecutor engaged in misconduct, Ms. Moss has not shown that it affected the outcome of her trial. *See Dukles*, 2013-Ohio-5263, at ¶ 33. *See also State v. Haywood*, 9th Dist. Summit No. 28040, 2017-Ohio-8299, ¶ 64. As such, we cannot conclude that the trial court abused its discretion by denying her motion for a mistrial. Ms. Moss' second assignment of error is overruled.

III.

{¶48} Ms. Moss' assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

————

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

THOMAS A. TEODOSIO
FOR THE COURT

HENSAL, J.
CALLAHAN, J.
CONCUR.

APPEARANCES:

ANGELA M. KILLE, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN R. DIMARTINO, Assistant Prosecuting Attorney, for Appellee.